05-2798-cv
W.R. Grace & Co.– Conn. v. Zotos International, Inc.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2005

(Argued: January 27, 2006)                                    Decided: March 4, 2009)

Docket No. 05-2798-cv

_____

W.R. GRACE & CO. – CONN.,

*Plaintiff-Appellant,*

– *v.* –

ZOTOS INTERNATIONAL, INC.,

*Defendant-Appellee.*

_____

BEFORE: RAGGI and HALL, *Circuit Judges*, and KORMAN, *District Judge.*[*]

_____

Owner W.R. Grace & Co. brought suit under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) against Defendant Zotos International, Inc. for costs incurred in connection with Grace's investigation and remediation of contamination at the Brewer Road site. The United States District Court for the Western District of New York (Skretny, *J.*) held Grace was not entitled to contribution under CERCLA and granted judgment in favor of Zotos. Grace appealed. Affirmed in part, reversed in part, and remanded.

_____

[*] The Honorable Edward R. Korman, United States District Court for the Eastern District of New York, sitting by designation.

KEVIN M. HOGAN, Phillips Lytle LLP, Buffalo, New York, *for Plaintiff-Appellant*.

THOMAS R. SMITH, (Robert R. Tyson, Lillian Abbott Pfohl, *on the brief*) Bond, Schoeneck & King, PLLC, Syracuse, New York, *for Defendant-Appellee*.

Robert Emmet Hernan, Michelle Aronowitz, Eugene J. Leff, and Gordon J. Johnson, for Eliot Spitzer, Attorney General for the State of New York, New York, New York, submitted a brief for Amicus Curiae the State of New York, in support of *Plaintiff-Appellant*.

Kevin A. Szanyi, Nelson Perel, A. Timothy Webster, Webster Szanyi LLP, Buffalo, New York; Jeffrey N. Martin, Eric J. Murdock, Hunton & Williams LLP, Washington, D.C., submitted a brief for Amici Curiae Allied Waste Systems, Inc. and Browning-Ferris Industries of New York, Inc., in support of *Defendant-Appellee*.

HALL, *Circuit Judge*:

Plaintiff W.R. Grace & Co.-Conn. ("Grace") seeks to recover necessary response costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") for costs Grace incurred in cleaning up a certain contaminated site in New York. The District Court (Skretny, *J.*) concluded Grace, which is itself a responsible party, is not entitled to recovery under CERCLA because Grace had not previously been a party to a CERCLA civil action, and entered judgment in favor of defendant Zotos International, Inc. ("Zotos"). *W.R. Grace & Co.–Conn. v. Zotos Int'l, Inc.*, No. 98-CV-838S(F), 2005 WL 1076117, at *12 (W.D.N.Y. May 3, 2005). Grace asserts it is entitled to seek an equitable share of its response costs from Zotos under section 107(a) of CERCLA. 42 U.S.C. § 9607(a). While this Court was considering the appeal, the Supreme Court decided *United States v. Atlantic Research*

2

*Corp.*, 127 S. Ct. 2331 (2007), which holds that CERCLA provides a potentially responsible party ("PRP") who has incurred costs of response in cleaning a contaminated site with a cause of action to recover those costs from other PRPs. We conclude that Grace has incurred response costs within the meaning of section 107(a) and remand to the district court for further proceedings.

## I. Background

In 1978, Grace acquired a facility known as the Brewer Road Site (the "Site") when it purchased the assets of a chemical manufacturer, Evans Chemetics, Inc. ("ECI"). ECI had used the Site as a landfill for wastes from a Waterloo, New York, manufacturing facility (the "Waterloo Plant") from 1950 through 1959. ECI manufactured organic compounds at the Waterloo Plant, and it formulated and packaged hair care products at the Waterloo Plant for sale to Zotos and other customers. Grace alleges that Zotos arranged for the disposal of certain of those wastes at the Site. Grace continues to own the Site today.

In 1983, the New York State Department of Environmental Conservation ("DEC") conducted a Phase I preliminary investigation of the Site, and in 1984 Grace entered into its first administrative order on consent to perform a Phase II investigation at the Site. After DEC placed the Site on the New York Registry of Inactive Hazardous Waste Disposal Sites, Grace cooperatively entered into a second administrative order on consent with DEC in 1988 (the "Consent Order").[1] Pursuant to that Consent Order, Grace agreed to reimburse DEC approximately $20,000 for response costs (including direct labor, analytical, and contractor costs)

---

[1] Because Grace does not seek response costs incurred pursuant to the 1984 order, only the response costs incurred pursuant to the 1988 consent order are the subject of the lawsuit.

incurred investigating the environmental conditions. Grace also agreed to perform a remedial investigation and feasibility study ("RI/FS"), and to remediate the landfill. The Consent Order provided specifically that there had been no admission of guilt or finding of liability. Upon the successful completion of the remedy, DEC expressly agreed to release Grace from all claims arising under the New York Environmental Conservation Law ("ECL") relative to the landfill.

The Consent Order stated that Grace "voluntarily consents to the issuing and entering of this Order, and without admitting any facts or the applicability of any law, waives its right to a hearing herein as provided by law, and consents to be bound by the provisions, terms and conditions of this Order." The Consent Order provided that at the conclusion of the program, if DEC acknowledged that implementation was complete,

> such acknowledgment [sic] shall constitute a full and complete satisfaction and release of each and every claim, demand, remedy or action whatsoever against [Grace], its officers and directors, which [DEC] has or may have as of the date of such acknowledgment [sic] pursuant to Article 27, Title 13, of the ECL relative to or arising from the disposal of hazardous or industrial waste at the Site.

The Consent Order also provided that Grace would reimburse DEC $20,967.64 for costs incurred in investigating the conditions at the Site and in preparing the Consent Order, as well as other sums concerning the costs of implementation of the feasibility study and remedial design. The Consent Order set out that the "failure of [Grace] to comply with any provision of this Order shall constitute a default and a failure to perform an obligation under this Order and under the ECL," and that "[n]othing herein shall be construed to bind any entity not specifically bound by the terms of this Order." Pursuant to the Consent Order, Grace remediated the Site in 1993 and has thereafter maintained the Site. Through April 2004, Grace had expended approximately $1.7 million on remedial activities at the Site.

4

Grace commenced the instant action in December 1998, seeking contribution from Zotos pursuant to CERCLA section 113(f), 42 U.S.C. § 9613(f), and New York law for the costs incurred in connection with the investigation and remediation of contamination at the Site. Following a bench trial, the District Court rendered a final decision and order dated May 3, 2005, in which it concluded that Grace is not entitled to reimbursement pursuant to CERCLA section 113(f) because it was neither a party to a civil suit nor a party to a settlement. The court also denied Grace's claims under state law.

Grace urges on appeal that it should have been entitled to seek contribution under § 113(f)(3)(B) due to its Consent Order with DEC. In the alternative, Grace argues that it was entitled to recover a portion of its costs pursuant to § 107(a)(4)(B).

## II. Discussion

Because this case turns on the interpretation of a federal statute, our review is *de novo*. *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000). We recognize that with respect to this review, our obligation is to look to the plain language of the statute to effectuate the intent of Congress. *See Natural Res. Def. Counsel v. Abraham*, 355 F.3d 179, 198-99 (2d Cir. 2004) ("In interpreting the plain language of the statute, we must look to the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate, its legislative history." (internal quotation marks omitted)); *see also Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (noting that, when inquiring into congressional intent through means of traditional statutory construction, courts "look to the provisions of the whole law, and to its object and policy" (internal quotation marks omitted)).

A.  **CERCLA**

CERCLA is a comprehensive federal law governing the remediation of hazardous waste sites.  Unfortunately, CERCLA, which was hastily enacted on the eve of the lame-duck session of the 96th Congressional term, is known neither for its concinnity nor its brevity.  *See, e.g.*, *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986) (noting CERCLA provisions are "not . . . model[s] of legislative draftsmanship," and its statutory language is "at best inartful and at worst redundant");  *Artesian Water Co. v. New Castle County*, 851 F.2d 643, 648 (3d Cir. 1988) ("CERCLA is not a paradigm of clarity or precision.  It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage.").  Nonetheless, it has now been over twenty-five years since CERCLA's enactment, and although many of the provisions remain perplexing, the statute's primary purposes are axiomatic: (1) to encourage the "timely cleanup of hazardous waste sites;" and (2) to "plac[e] the cost of that [cleanup] on those responsible for creating or maintaining the hazardous condition."  *Consol. Edison v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005) (second alteration in original) (internal quotation marks omitted); *see also Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n.13 (1994) ("'CERCLA is designed to encourage private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others.'" (quoting *FMC Corp. v. Aero Indus., Inc.,* 998 F.2d 842, 847 (10th Cir. 1993))).  Thus, on review, this Court must "construe the statute liberally in order to effect these congressional concerns."  *Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir. 1996).

In order to achieve these dual purposes, the statute creates several distinct provisions that authorize parties in different procedural positions to recover costs incurred in cleaning up

contamination: "(1) section 107(a), which permits the general recovery of cleanup and prevention costs;[2] (2) section 113(f)(1), which creates a contribution right for parties liable or potentially liable under CERCLA; and (3) section 113(f)(3)(B), which creates a contribution right for parties that have resolved their liability by settlement." *Consol. Edison*, 423 F.3d at 94. While courts have previously struggled with interpreting which of these subsections provides a cause of action for parties in differing procedural and factual circumstances, two Supreme Court decisions have shed light on these two sections of CERCLA. *See Atl. Research Corp.*, 127 S. Ct. 2331 (holding CERCLA section 107(a) provides potentially responsible parties with cause of action to recover necessary costs of response from other PRPs); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) (holding private parties who have not been sued in a CERCLA administrative or cost recovery action may not bring a contribution suit under section 113).

In *Cooper Industries*, the Supreme Court held that a party may pursue a contribution claim under section 113(f)(1) only if that party has been subject to a civil action as specified in that section, *id*. at 583, a limitation most courts had not previously imposed, *see, e.g.*, *Bedford Affiliates v. Sills*, 156 F.3d 416, 423-24 (2d Cir. 1998) (assuming that a liable party that was not the subject of a civil action could bring a contribution claim under section 113(f)(1)). Before *Cooper Industries*, most courts, including ours, held that in connection with application for reimbursement from other potentially liable parties, only section 113(f) provided a cause of action to parties who would be liable, and section 107(a) was reserved for innocent parties. *See, e.g., Bedford Affiliates*, 156 F.3d at 423; *see also Metro. Water Reclamation Dist. of Greater*

---

[2] "We assume without deciding that § 107(a) provides for joint and several liability." *Atl. Research Corp.*, 127 S. Ct. at 2339 n.7.

*Chicago v. N. Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 828 & n.4 (7th Cir. 2007). *Bedford Affiliates* held that the plaintiff "could not pursue a § 107(a) cost recovery claim against [the defendants] due to its status as a potentially responsible person." 156 F.3d at 423-24. Following *Cooper Industries*, this Court indicated that *Bedford Affiliates* may no longer be good law because the assumption that a potentially liable party seeking reimbursement had a cause of action under section 113(f)(1), even if the party had not been subject to a prior CERCLA suit, was invalidated by *Cooper Industries*. *Consol. Edison*, 423 F.3d at 101 n.12. *Consolidated Edison* thereby suggested that *Cooper Industries* had implicitly overruled *Bedford Affiliates*. However, it did not reach the ultimate decision of whether *Bedford Affiliates* had been overruled because the Court concluded that factual discrepancies distinguished the case before it from *Bedford Affiliates* such that it did not need to consider directly the issue. *Consol. Edison*, 423 F.3d at 100-02.

Subsequent to our decision in *Consolidated Edison*, the Supreme Court in *Atlantic Research* held that "the plain terms of § 107(a)(4)(B) allow a PRP to recover costs from other PRPs." 127 S. Ct. at 2339. In light of *Atlantic Research*, we now confirm that *Bedford Affiliates*'s holding limiting recoveries by PRPs to actions brought under section 113(f) is no longer valid. *See New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 207 (2d Cir. 2006); *BankBoston, N.A. v. Sokolowski* (*In re Sokolowski*), 205 F.3d 532, 534-35 (2d Cir. 2000) (This Court is "bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc*" (quotation marks and citation omitted)).

That a PRP may assert a claim under section 107 as provided in *Atlantic Research*,

however, does not put an end to the question of whether a party such as Grace may maintain a

cause of action for recovery of response costs. As the Court stated in *Atlantic Research*, "§

107(a) permits a PRP to recover only costs it has 'incurred' in cleaning up a site." 127 S. Ct. at

2338 (citing 42 U.S.C. § 9607(a)(4)(B)). Accordingly, the question before us is whether a

potentially responsible party who has remediated a contaminated site pursuant to an

administrative consent order has a cause of action to pursue necessary associated costs under

section 107. We conclude that it does.

## B. Section 113(f)(3)(B)

On appeal, Grace first asserts that it should be able to bring a cause of action for

contribution under section 113(f)(3)(B). In the alternative, Grace asserts it has a cause of action

under section 107(a). We will first consider Grace's arguments with respect to section

113(f)(3)(B).[3]

Grace acknowledges that, after *Cooper Industries*, it may not bring a cause of action

against Zotos under section 113(f)(1) because Grace has not already been subject to a civil suit

under either section 106 or 107. Grace asserts that since its Consent Order with the DEC

---

[3] Initially, Grace asserted its cause of action under section 113(f) generally, and also specifically referred to section 113(f)(1). *Grace*, 2005 WL 1076117, at *3 n.6. *Cooper Industries* was decided while the case was pending decision after trial, and Grace and Zotos were granted leave to brief the significance of that case to the District Court. Grace raised its section 113(f)(3)(B) claim at that stage, which was addressed and denied by the District Court. *Id*. at *3. The district court's decision in this case was rendered prior to our holding in *Consolidated Edison*, and neither the parties nor the court discussed whether Grace had a viable cause of action under section 107(a).

qualifies as an administrative settlement under section 113(f)(3)(B), it should be able to pursue a cause of action against Zotos pursuant to this section.

Under the principles enunciated in *Consolidated Edison*, we conclude Grace may not seek contribution under section 113(f)(3)(B). 423 F.3d at 95-96. *Consolidated Edison* made clear that "only when liability for CERCLA claims, rather than some broader category of legal claims, is resolved" does section 113(f)(3)(b) create a right to contribution. *Id*. at 95. Accordingly, the "operative question in deciding whether [Grace's] claims arise under section 113(f)(3)(B) . . . is whether [Grace] resolved its CERCLA liability before bringing suit." *Id.* at 96. We conclude it has not.

The 1988 Order on Consent provides:

> If the [DEC] acknowledges that the implementation is complete . . . such acknowledgment shall constitute a full and complete satisfaction and release of each and every claim, demand, remedy or action whatsoever against [Grace], its officers and directors, which the [DEC] has or may have as of the date of such acknowledgment *pursuant to Article 27, Title 13, of the ECL* relative to or arising from the disposal of hazardous or industrial waste at the Site.

(emphasis added). The Consent Order further states: "Nothing contained in this Order shall be construed as barring, diminishing, adjudicating or in any way affecting . . . (3) the [DEC's] right to bring any action, at law or in equity against [Grace] . . . with respect to areas or resources that may have been damaged as a result of the release or migration of hazardous or industrial wastes from the Site." This text, which makes no reference to CERCLA, establishes that the DEC settled only its state law claims against Grace, leaving open the possibility that the DEC or the EPA could, at some future point, assert CERCLA or other claims. In the same way that the voluntary consent agreement in *Consolidated Edison* did not resolve Consolidated Edison's liability under CERCLA, neither did this Consent Order resolve Grace's liability under

10

CERCLA. *See City of Waukesha v. Viacom Int'l Inc.*, 404 F. Supp. 2d 1112 (E.D. Wis. 2005) (citing *Consolidated Edison* and the district court's decision in that case, and holding that the cost share pilot program contract the City entered with State's Department of Natural Resources was not an administrative or judicially approved settlement that resolved the City's CERCLA liability).

The Consent Order at issue here did not resolve CERCLA claims that could be brought by the federal government. As the district court correctly observed, "[w]here a state proceeds on its own authority to identify a remedy and settle with a PRP, there is a risk the EPA will take later actions or select different remedies that could expose the PRP to additional liabilities." *Grace*, 2005 WL 1076117 at *5. We conclude that the Consent Order with the DEC was not an administrative settlement cognizable under section 113(f)(3)(B), and we affirm the District Court's decision that Grace may not bring an action for contribution against Zotos under that section.

**C. Section 107(a)(4)(B)**

Acknowledging that *Atlantic Research* holds that a potentially responsible party may assert a claim under section 107(a)(4)(B) to recover incurred cleanup costs, Zotos maintains that Grace may not pursue a claim for cost recovery because Grace has not incurred response costs within the meaning of section 107(a).[4] Specifically, Zotos contends that because Grace "was compelled to incur costs pursuant to an administrative order," it has not incurred response costs within the meaning of section 107(a), and therefore has no cause of action against Zotos. To

---

[4] *Atlantic Research*, 127 S. Ct. 2331, was issued after oral argument had been heard in this case and while the matter was pending with this Court. Grace and Zotos were given leave to file supplemental briefing on the effect of *Atlantic Research* on this case.

support its claim that Grace's cleanup costs were not incurred costs within the meaning of the statute, Zotos cites *Consolidated Edison*, 423 F.3d 90, 101-02. Zotos's rationale, however, is misguided. We hold that Grace may pursue necessary response costs pursuant to section 107(a) even though its expenditures were made in compliance with a consent order.

Generally, response costs are liberally construed under CERCLA, *see, e.g., Amoco Oil Co. v. Borden Inc.*, 889 F.2d 664 (5th Cir. 1989) ("Response costs are generally and specifically defined to include a variety of actions designed to protect the public health or the environment. To justifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment."). This liberal construction is in conformity with the plain language of the statute. As defined by CERCLA, the terms "respond" or "response" mean "remove, removal, remedy, and remedial action; all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25). A "remedial action" is defined in section 101(24) as "those actions consistent with permanent remedy," generally referring to the final remedy selected to address the contamination at the hazardous waste site. 42 U.S.C. § 9601(24).[5] Under the statute, therefore, Grace undertook remedial action as that term is defined in section 101(24), 42 U.S.C. § 9601(24), and thus performed a "response" action as that term is defined in section 101(25), 42 U.S.C. §

---

[5] A "removal action" refers generally to temporary actions taken to address immediate threats to the environment. 42 U.S.C. § 9601(23). The clean-up action taken here was remedial in nature.

12

9601(25).[6] *See also Syms v. Olin Corp.*, 408 F.3d 95, 101 (2d Cir. 2005) ("CERCLA defines the term 'response' as encompassing both 'removal' efforts and 'remedial actions.'").

Under the plain language of the statute, the fact that a party enters into a consent order before beginning remediation is of no legal significance with respect to whether or not the party has incurred response costs as required under section 107(a). Our reliance on the statutory language conforms with the Supreme Court's emphasis on the text of CERCLA in interpreting section 107(a). *See e.g. Atl. Research*, 127 S. Ct. at 2336 (stating that the structural relationship of the text must "be read as a whole," and that the "*plain language* of subparagraph (B) authorizes cost-recovery actions by any private party, including PRPs" (emphasis added)). Indeed, the Court concluded that "[b]ecause the plain terms of § 107(a)(4)(B) allow a PRP to recover costs from other PRPs, the statute provides Atlantic Research with a cause of action." *Id.* at 2339. In the same manner that section 107(a) is not limited solely to "innocent" parties, *see id.*, section 107(a) does not specify that only parties who "voluntarily" remediate a site have a cause of action.

Section 107 "permits a PRP to recover only the costs it has 'incurred' in cleaning up a site." *Id*. at 2338 (citing 42 U.S.C. § 9607(a)(4)(B)). Section 107(a) "permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs." *Id.* A party who "pays to satisfy a settlement agreement or a court judgment," however, "does not incur its

---

[6] The plain language of section 107(a) allows any person to seek recovery for "necessary costs of response" in removal or remediation action. 42 U.S.C. § 9607(a)(4)(B). There is no dispute that Grace is a "person" under the statute. 42 U.S.C. § 9601(21) ("The term 'person' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.").

own costs of response. Rather, it reimburses other parties for costs that those parties incurred." *Id*; *see also Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 934 (9th Cir. 2008) ("[A] PRP who has not been subject to a § 106 or a § 107 action . . . is not entitled to seek contribution under § 113. Instead, he should proceed under § 107 for cost recovery."). Here, Grace seeks to recover costs for remediation it performed itself; it does not seek to recoup expenses incurred in satisfying a settlement agreement or a court judgment. We conclude that Grace may seek recovery for incurred response costs under section 107(a).[7]

Our holding that Grace incurred response costs even though it conducted the remediation pursuant to a consent order is consistent with prior decisions that have allowed potentially responsible parties to seek cost recovery under section 107(a) despite government involvement and oversight. In *Schaefer v. Town of Victor,* the plaintiff underwent eight years of enforcement proceedings from New York's DEC with respect to a contaminated landfill and had entered into two consent orders with the DEC regarding the landfill's closure and remediation. 457 F.3d 188, 191-92 (2d Cir. 2006). The first consent order required investigation of the possible environmental threat posed by the landfill; two years later, the second consent order required closure. The *Schaefer* Court held the plaintiff could bring a cause of action under section 107 because the plaintiff had begun to incur some response costs before the final consent order requiring closure of the site. *Id.* at 201-02 (concluding that even "under the holding of this Court in *Consolidated Edison,* Schaefer may bring this action under § 107"). Despite the fact that

---

[7] As the Supreme Court suggested, it may well be that a party who sustains expenses pursuant to a consent decree following a suit under section 106 or section 107(a) may have a cause of action under either section 113(f), section 107(a), or *both*. *Atl. Research*, 127 S. Ct. at 2338 n.6. We need not address this issue here as Grace did not enter into the consent decree following suit. *See id.*

Schaefer acted pursuant to extensive agency oversight, the *Schaefer* Court concluded that Schaefer had incurred costs of response during the closure process and thus could seek to recover those necessary costs under section 107(a).

Similarly, in *Consolidated Edison*, the plaintiff entered into a "voluntary cleanup agreement" with New York's DEC after the agency had required the plaintiff to submit information concerning possible contamination at over 100 of its properties. 423 F.3d at 93. The plaintiff had remediated the sites at issue only pursuant to the agreement, which plaintiff completed in return for the DEC's waiving some of its liability. *Id.* at 96. As the Court found, Consolidated Edison was a potentially responsible party, not an innocent party, seeking recovery. *Id.* at 100. New York in fact expressly contemplated that such "Potentially Responsible Part[ies]" would enter into agreements with the DEC through the "voluntary cleanup program" to avoid liability with the state. The state's volunteer cleanup program guide differentiates between PRPs and "innocent" owners, and it places different substantive and procedural compliance requirements upon these two types of parties.

Consolidated Edison was no more an "innocent" volunteer than Grace. Both parties would have been vulnerable to suit by the state absent proper remediation conducted under the respective agreements with the state. More importantly, there is no doubt the DEC would not have precluded Grace from entering into a voluntary consent agreement merely because Grace is

a PRP.[8]  Indeed, the DEC states in the Voluntary Cleanup Program Guide that a voluntary

cleanup "agreement" may be characterized as an "order" upon the request of a party.

For the purposes of CERCLA, therefore, the voluntary agreement in *Consolidated Edison*

differs from the Consent Order in Grace in title only—both were agreements made with the DEC

to remediate voluntarily contaminated sites and to avoid liability.  We note that the State of New

York's position, articulated in its *amicus* brief in this case, further supports this contention.  New

York asserts "there is no practical difference between an agreement under the Voluntary Cleanup

Program and a settlement in the form of an administrative consent order under the State Inactive

Hazardous Waste Disposal Site program, such as Grace signed."  Because the determination of

whether a party has a cause of action under section 107(a) cannot turn on the semantics of the

state program's title, which will undoubtedly vary from state to state and be subject to internal

state modifications, we find no reason to distinguish the case at bar from other cases in which we

allowed PRPs who acted pursuant to administrative agreements to seek to recover expenses

under section 107(a).

The relevant inquiry with respect to section 107(a) is whether the party undertook the

remedial actions without the need for the type of administrative or judicial action that would give

rise to a contribution claim under section 113(f).  *See Atl. Research*, 127 S. Ct. at 2338.  Grace,

like the *Consolidated Edison* plaintiff who was found to have a cause of action for recovery of

response costs, chose to enter into an agreement with the state to investigate and remediate a

---

[8] Grace adds that New York's Voluntary Cleanup Program was not adopted until 1994.
Prior to that date, the only way a party could "voluntarily" undertake a cleanup, obtain DEC's
approval and oversight of a remedial plan, and receive release of some liability was to enter a
consent order with the DEC.

16

contaminated site.  Grace saved the parties and the government litigation costs, and presumably also limited ongoing contamination by promptly remediating the site.  Although Grace entered into a consent order with the state, that fact alone and the title of its agreement with DEC do not preclude it from bringing an action pursuant to section 107(a).

While it is "'ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed,'" *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 122 (2d Cir. 2007) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)), in this instance the text of the law mandates a statutory interpretation that also supports the principal congressional concerns of ensuring that those responsible promptly clean up and pay for removal of hazardous waste.  *See, e.g.*, Rep. Volkmer 96 Cong. House Debates 1980, 26351 ("Creation of a superfund will lead to the prompt cleanup of hazardous dumps once discovered and thus will lessen the risk of harm to human beings.").  One of CERCLA's main purposes is to "'encourage private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others.'" *Key Tronic Corp.*, 511 U.S. at 819 n.13 (quoting *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 847 (1993)).  As Sen. Culver stated in the Senate debates regarding the bill, "[The statutory] purposes are to provide a way for the Government to rapidly clean up and mitigate chemical disasters, to assure injured victims prompt and adequate compensation, and to create an incentive for both a high standard of care and for a responsible party to clean up its own releases."  96 Cong. Senate Debates 1980, 30952.

We are also mindful that CERCLA was established with the intent that the federal and state governments would cooperate in order to remediate environmental hazards expeditiously and appropriately.  *See United States v. Colorado,* 990 F.2d 1565, 1575 (10th Cir. 1993); *Manor*

17

*Care, Inc. v. Yaskin,* 950 F.2d 122, 125-26 (3d Cir. 1991) (Alito, *J.*). We find no basis for interpreting CERCLA in a way that would discourage parties from entering agreements with the states to ensure a proper cleanup. To disallow a party who has entered into a consent order with an administrative agency to seek recovery of expenditures from other PRPs would discourage cooperation with state agencies. While potentially liable parties might still attempt to clean up a contaminated site, we see no practical or statutory purpose in discouraging parties from remediating contaminated sites in a manner that provides agency oversight of the remediation.

Moreover, interpreting the statute such that a potentially liable party, like Zotos, bears no financial responsibility for remediation costs, while the party that actually consented without litigation to remediate a contaminated site bears the total financial burden of the remediation, does not comport with the intended purposes of the statute. *See Consol. Edison*, 423 F.3d at 94 (noting the primary purposes of CERCLA include "encouraging the timely cleanup of hazardous waste sites" and "placing the cost of that [cleanup] on those responsible for creating or maintaining the hazardous condition" (alteration in original) (internal quotation marks omitted)). If a potentially liable party believed it could avoid liability altogether by doing nothing while another liable party negotiates with a state agency, it will have less incentive to cooperate in remediation. *See, e.g.*, Rep. Florio, 96 Cong. House Debates 1980, 26338 (reiterating the objectives of CERCLA, which include that "[i]t creates a strong incentive both for prevention of releases and voluntary cleanup of releases by responsible parties").

Faced with environmental hazardous waste contamination on its land, Grace did not wait for a lawsuit before attempting to remediate. Instead, it promptly entered into a consent order with a state agency and cleaned up the site. By doing so it avoided additional contamination

caused by delay, as well as saved itself, other potentially liable parties, and the state and federal governments cleanup costs. We cannot conclude that Congress intended to bar such a plaintiff from seeking recovery of costs from other responsible parties, and to allow those potentially liable parties to avoid financial responsibility, particularly where nothing in the statute speaks to such a limitation. *See* 42 U.S.C. § 9607(a)(4)(B). Moreover, had Grace not acted responsibly by entering into the consent order with the DEC, and instead waited for suit, it would have had a cause of action for contribution under section 113(f)(1), but that course of action would arguably have occasioned both further contamination and greater expenses associated with the delay in instituting litigation.

### D. Necessary Costs of Response

The statute allows for recovery of only "*necessary* costs of response . . . consistent with the national contingency plan." § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). We note that Zotos stipulated at an earlier stage in the proceedings that "[a]t least some" of the costs Grace incurred were "necessary," and "consistent with the National Contingency Plan," and within the meaning of 42 U.S.C. § 9607(a)(4)(B). Because the district court concluded that Grace had no cause of action, it made no determination with respect to the nature of the costs incurred. We make no judgment about that issue, which is a matter to be decided by the district court in the first instance.

### III. Conclusion

We hold that parties who have not been subject to a civil action under section 106 or section 107 but who have remediated a contaminated site pursuant to a consent order entered with a state agency may bring a cause of action to recover necessary costs of response under

19

CERCLA section 107(a).  We affirm the judgment of the District Court with respect to its dismissal of Grace's section 113(f)(3)(B) claim.  With regard to Grace's claim under section 107(a), we reverse and we remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.