**ASARCO LLC, a Delaware corporation, Plaintiff,**

v.

**ATLANTIC RICHFIELD COMPANY, a Delaware corporation, Defendant.**

**No. CV 12–53–H–DLC.**

United States District Court, D. Montana, Helena Division.

Signed Aug. 26, 2014.

Gregory Evans, James G. Warren, Daphne Hsu, Laura G. Brys, Integer Law Corporation, Los Angeles, CA, William Adam Duerk, Rachel H. Parkin, Milodragovich Dale Steinbrenner, Missoula, MT, for Plaintiff.

Benjamin B. Strawn, Kenzo Kawanabe, William J. Duffy, Davis Graham & Stubbs, LLP, Elizabeth H. Temkin, Temkin Wielga & Hardt LLP, Denver, CO, Jason T. Hungerford, Norton Rose Fulbright LLP, England, Randy J. Cox, Mary Cile Glover Rogers, Randy J. Tanner, Boone Karlberg, P.C., Missoula, MT, for Defendant.

## ORDER

DANA L. CHRISTENSEN, Chief Judge.

Before the Court is Defendant Atlantic Richfield Company's ("Atlantic Richfield") motion for summary judgment, the resolution of which hinges on two issues. First, does a consent decree ASARCO entered into with the United States in 1998 trigger CERCLA's 3–year statute of limitations for contribution actions despite the fact that the decree does not expressly address CERCLA liability. This issue has not been addressed by the Ninth Circuit Court of Appeals, and in the two circuits which have addressed this issue, the Second and Third, conflicting conclusions were reached. Second, to what extent does a 2009 consent decree between ASARCO and the United States create new cleanup costs or obligations not covered in the 1998 consent decree. For the reasons articulated herein, the Court finds that the 1998 consent decree did trigger the statute of limitations, and that the 2009 consent decree extended ASARCO's obligations no further than the 1998 decree. The Court grants summary judgment in favor of Atlantic Richfield.

### Factual Background

ASARCO operated a lead smelter at the East Helena Site ("Site") from 1888 until 2001. Atlantic Richfield's predecessor, the Anaconda Company, constructed and operated a zinc fuming plant on land leased from ASARCO at the site from 1927 to

1972. ASARCO purchased the zinc plant from Anaconda in 1972 and continued to operate it until 1982. Operations at the site released numerous hazardous substances, causing the Environmental Protection Agency ("EPA") to add the site to the National Priorities List under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), more commonly known as "Superfund," in 1984.

ASARCO and the EPA entered into several consent decrees, including one dated May 5, 1998 ("1998 Decree") that resolved claims EPA had brought against ASARCO for multiple violations of the Resource Conservation and Recovery Act ("RCRA") and the Clean Water Act ("CWA"). Under this Decree, jurisdiction over all Site-related cleanup was transferred from the CERCLA program to the RCRA program. While the contents and scope of this Decree are addressed at length below, suffice it to say that the Decree was comprehensive, and required ASARCO to conduct a wide range of activities regarding the contamination.

In 2005, ASARCO filed for Chapter 11 bankruptcy protection. The United States and the State of Montana (collectively referred to as "governments") filed proofs of claim in the bankruptcy proceeding for cleanup of the Site. During the bankruptcy proceeding, ASARCO and the governments entered two settlements regarding the East Helena Site, the second of which was a judicially approved consent decree entered into in June of 2009 ("2009 Decree"). The June 2009 Decree is the subject of the instant motion. It resolved ASARCO's environmental liabilities to the governments at several sites, including East Helena, and created a custodial trust and trust account for each of the Montana properties. The 2009 Decree also required ASARCO to transfer all property rights and interests in the East Helena Site to

the trust, and pay $99.294 million into the trust account for that Site, The Montana Environmental Trust Group ("METG") was appointed custodial trustee to oversee the trust and trust account for the Site. The bankruptcy court approved ASARCO's plan of reorganization in November of 2009.

ASARCO filed its Complaint in this case in June of 2012, which it amended on September 11, 2012. ASARCO seeks contribution pursuant to CERCLA for the $99.294 million it paid under the 2009 Decree. Atlantic Richfield now seeks summary judgment, arguing that CERCLA's 3–year statute of limitations for such contribution claims began to run upon entry of the 1998 Decree, and that the 2009 Decree does not create any specific or new obligations as to the East Helena Site that were not covered in the 1998 Decree.

## Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted), The movant's burden is satisfied when the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his

pleading, but ... must set forth specific facts showing that there is a genuine issue for trial," *Id.* at 248, 106 S.Ct. 2505 (internal quotation marks omitted).

## Analysis

In response to widespread public outcry following the Love Canal tragedy in Niagara Falls, New York, Congress enacted CERCLA in 1980 to facilitate the prompt cleanup of hazardous waste sites. CERCLA is a unique and powerful statute, imposing strict and joint and several liability on countless parties for contamination reaching back to the Nineteenth Century. It grants the federal and state governments broad power to effectively and efficiently remediate hazardous contamination, and creates incentives for parties to actively participate in removal and remedial actions.

In 1986, Congress passed the Superfund Amendments and Reauthorization Act ("SARA"), which amended CERCLA and created mechanisms by which parties that have taken certain specific affirmative actions to address contamination can seek contribution against other potentially liable parties. This motion hinges on one such mechanism, CERCLA § 113(f)(3)(B), which provides:

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(3)(B). Contribution claims based on judicially approved settlements are subject to a 3-year statute of limitations. 42 U.S.C. § 9613(g)(3)(B) ("No action for contribution for any response costs or damages may be commenced more than 3 years after ... entry of a judicially approved settlement with respect to such costs or damages").

Neither the law nor common logic supports the concept that a statute of limitations could run on a claim that has not yet accrued. Atlantic Richfield's argument that the 3-year statute of limitations has run is predicated on its assertion that the court's approval of the 1998 Decree—which admittedly makes no express reference to CERCLA liability—gave rise to a contribution claim under § 113(f)(3)(B).[1] This is a multi-faceted question that involves a novel question of law that has yet to be resolved by the Ninth Circuit and a fact specific inquiry as to the 1998 and 2009 Decrees.

The Court first considers whether CERCLA § 113(f)(3)(B) provides a contribution claim where a party has not ex-

---

**1.** Atlantic Richfield relies heavily on a paragraph contained in the Court's order of November 30, 2012, 2012 WL 5995662, stating:

> To the extent that [the 1990, 1998, and February 2009] agreement[s] covered a portion of the costs for which ASARCO seeks contribution here [based on the June 2009 Decree], the statute of limitations was triggered for those specific costs when the agreement was entered. Three of the four agreements were entered more than three years before ASARCO filed this action. Thus, the statute of limitation to seek contribution for the costs covered in the 1990, 1998, and February 2009 consent decrees had expired.

(Doc. 49 at 5.) The Court declined to resolve any potential overlap at the early stage of the litigation before the parties had the benefit of complete discovery. At that time, none of the parties raised the issue of whether the 1998 Decree even gave rise to a CERCLA contribution claim, which is the dispositive legal issue now before the Court. Thus, although the Court essentially reaches the same conclusion as it did in November of 2012, it does so not based on its 2010 statement, but on CERCLA's plain text and overarching purpose in light of the parties well crafted arguments, and the guidance of other courts that have tackled the issue.

pressly settled its CERCLA liability. While the Ninth Circuit has yet to address this issue, as previously stated the Second and Third Circuits have. Unfortunately, although not surprisingly given the widely-shared opinion that CERCLA is not a model of legislative draftsmanship,[2] those courts have taken opposing positions.

The Second Circuit interprets § 113(f)(3)(B) "to create a contribution right only when liability for CERCLA claims, rather than some broader category of legal claims, is resolved." *Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.,* 423 F.3d 90, 95 (2d Cir. 2005). In *Consolidated Edison,* Con Ed sued UGI Utilities to recover costs it had incurred and would incur in cleaning up several sites on which UGI allegedly operated manufactured gas plants. Con Ed alleged that UGI was liable for remedial costs under CERCLA, as well as under New York State law. After filing suit, Con Ed entered into a voluntary agreement with the New York State Department of Environmental Conservation ("NYDEC"), in which it agreed to cleanup over 100 sites, including those subject to its suit against UGI, as a means to resolve its liability under state law. The court did not discuss the issue at length, basing its holding on § 113(f)(3)(B)'s requirement that the party seeking contribution must have resolved its liability for "response action[s]," which it characterized as a "CERCLA-specific term describing an action to clean up a site or minimize the release of contaminants in the future." *Id.* at 95–96. The court also looked to SARA's legislative history, quoting from the report of the House Committee on Energy and Commerce that § 113 " 'clarifies and con-

firms the right of a person held jointly and severally liable *under CERCLA* to seek contribution from other potentially liable parties.' " *Id.* at 96 (citing and quoting H.R.Rep. No. 99–253(1), at 79 (1985), 1986 U.S.C.C.A.N. 2835, 2861 (emphasis added by the court)). On those bases, the Court held that "section 113(f)(3)(B) does not permit contribution actions based on the resolution of liability for state law—but not CERCLA—claims." *Id.*

Several years after its decision in *Consolidated Edison,* the court revisited the issue of what type of liability must be "resolved" for a party to bring a claim under § 113(f)(3)(B) in *W.R. Grace & Co.-Conn. v. Zotos International, Inc.,* 559 F.3d 85 (2d Cir.2009). Plaintiff W.R. Grace acquired a site that ECI had used as a landfill for wastes generated by one of its facilities that manufactured organic compounds and hair care products that it then sold to defendant Zotos and other customers, In 1983, several years after acquiring the site, W.R. Grace entered into a consent order with the NYDEC in which it agreed to reimburse the State for response costs incurred in investigating the site, to perform a remedial investigation and feasibility study, and to remediate the site. In exchange, NYDEC agreed to release W.R. Grace from all New York State law claims "arising from the disposal of hazardous or industrial waste at the Site" upon successful completion of remediation. *W.R. Grace,* 559 F.3d at 87. Grace remediated and maintained the site pursuant to the agreement, and sued Zotos in 1998 seeking contribution pursuant to CERCLA based on a theory of arranger liability, and under New York law for the costs incurred during the investigation and remediation

---

**2.** As the Second Circuit stated in *W.R. Grace & Co.-Conn. v. Zotos Intern. Inc.,* "[u]nfortunately, CERCLA, which was enacted on the eve of the lame-duck session of the 96th Congressional term, is known neither for its con-

cinnity nor its brevity." 559 F.3d 85, 88 (2d Cir.2009) (quoting several cases that pre-date § 113(f)(3)(B), which was enacted in 1986 under SARA).

of the site. The district court concluded that W.R. Grace was not entitled to reimbursement pursuant to CERCLA § 113(f) because it was not a party to either a civil suit or a settlement. On appeal, W.R. Grace argued that it was permitted to seek contribution under § 113(f)(3)(B) as the result of the consent order.

The Second Circuit maintained its position, holding that " 'the operative question in deciding whether [Grace's] claims arise under section 113(f)(3)(B) ... is whether [Grace] resolved its CERCLA liability before bringing suit' " *Id.* at 90–91 (citing *Consolidated Edison,* 423 F.3d at 96), The court did not engage in an analysis or discussion of its reasoning beyond "the principles enunciated in *Consolidated Edison,*" *id.* at 90, which were limited to a sentence contained in the House's SARA Report and the determination that "response action" is a "CERCLA-specific term," *Consolidated Edison,* 423 F.3d at 95–96. The court examined the text of the consent order, including the release of state law liability and the NYDEC's reservation of its right to bring an action "with respect to areas or resources that may have been damaged as a result of the release or mitigation of hazardous or industrial wastes from the Site." *W.R. Grace,* 559 F.3d at 91. It held that the consent order did not resolve Grace's CERCLA liability, and left open "the possibility that the DEC or the EPA could, at some future point, assert CERCLA or other claims," *Id.* The court concluded that "[u]nder the principles enunciated in *Consolidated Edison* ... Grace may not seek contribution under section 113(f)(3)(B)." *Id.* at 90,

Although *Consolidated Edison* and *W.R. Grace* clearly establish that within the Second Circuit § 113(f)(3)(B) does not give rise to a contribution claim unless the administrative or judicially approved settlement specifically resolves CERCLA lia-

bility, that court's most recent opinion touching upon this issue casts doubt on the continued viability of that holding—which it referred to as "the *Consolidated Edison/W.R. Grace* problem," *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,* 596 F.3d 112, 126 n. 15 (2d Cir.2010). In *Niagara Mohawk* the panel included a footnote in which it quoted the following passage from an amicus brief filed by the EPA, which it characterized as "understandably tak[ing] issue with our holding in *Consolidated Edison* ":

> The United States was not a party to *Consolidated Edison* and believes it was not correctly decided. Section 113(f)(3)(B) applies where a PRP "has resolved *its liability to* ... a State for some or all of a response action or for some or all of the costs of such action." 42 U.S.C. § 9613(f)(3)(B). The settlement of federal and state law claims other than those provided by CERCLA fits within § 113(f)(3)(B) as long as the settlement involves a cleanup activity that qualifies as a "response action" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).

*Id.* The court went on to comment that while "there is a great deal of force to this argument given the language of the statute," it need not address the issue because the consent order at issue in that case clearly encompassed CERCLA liability. *Id.*

The Third Circuit expressly rejected the Second Circuit's interpretation of § 113(f)(3)(B) in *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.,* 735 F.3d 131 (3d Cir.2013), adopting a position that addresses the *Niagara Mohawk* panel's concern—and one that this Court believes is truer to the express language of that provision. Trinity sought § 113(f)(3)(B) contribution based on a consent order absolving it of liability under two Pennsylvania

statutes. The court held "[n]otwithstanding the rule adopted by the Court of Appeals for the Second Circuit and by various district courts ... § 113(f)(3)(B) does not require resolution of CERCLA liability in particular." *Id.* at 136. The court first looked to the plain language of the statute itself, finding that it "requires only the existence of a settlement resolving liability to the United States or a state 'for some or all of a response action.' Section 113(f)(3)(B) does not state that the 'response action' in question must have been initiated pursuant to CERCLA—a requirement that might easily have been written into the provision." *Id.* In support of this conclusion, the court looked to its case law in the context of CERCLA's cost-recovery provision, § 107(a), citing *United States v. Rohm and Haas Co.* in which it held that if a government action qualifies as a "removal action" under the definition contained in CERCLA, the government's costs are recoverable under the unambiguous language of § 107, regardless of what statutory authority was invoked by EPA in connection with its actions. 2 F.3d 1265, 1274–75 (3d Cir.1993) (the court continued, stating "We find no support in the text or legislative history of CERCLA for the suggestion that identical oversight activity on the part of the government should be considered a removal if the government invokes CERCLA, but not a removal if other statutory authority is invoked"). The court also addressed the statement from the House Report relied upon by the *Consolidated Edison* court, clarifying that it "refers to contribution claims under § 113(f)(1), not § 113(f)(3)(B), as it is only through a civil action under ... [CERCLA § 113(f)(1) ] that a PRP may be held jointly and severally liable for response costs under CERCLA." *Trinity Industries,* 735 F.3d at 136 (internal citations and quotation marks omitted). "The Court concluded that § 113(f)(3)(B) does not require that a party have settled its liability under CERCLA in particular to be eligible for contribution." *Id.*

■ This Court agrees with the Third Circuit and the *Niagara Mohawk* panel. The plain language of § 113(f)(3)(B) provides a contribution claim to parties that have resolved their liability for "some or all of a *response action* or for some or all of the costs of such action in ... [a] judicially approved settlement." 42 U.S.C. § 9613(f)(3)(B) (emphasis added). The *Consolidated Edison* court is correct that "response action" is a highly significant term under CERCLA; it has, despite its brevity, sparked an enormous volume of litigation, giving it an outsize role in contributing to CERCLA's reputation as "the lawyer employment act." However, the significance of that term within the statute and the jurisprudence that has developed around it does not somehow permit it to become subsumed by that statute as *Consolidated Edison* suggests. While the court in that case deemed the term "CERCLA-specific," *Consolidated Edison,* 423 F.3d at 95, its holding indicates it actually interpreted the term "response action" to be CERCLA-exclusive. The most logical and appropriate construction is simply to apply CERCLA's definition of the term "response," which encompasses the terms "remove, removal, remedy, and remedial action ... includ[ing] enforcement activities related thereto." 42 U.S.C. § 9601(25) [CERCLA § 101(25) ]. These terms are in turn defined under CERCLA, which states:

> The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of

hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

42 U.S.C.A. § 9601(23) [CERCLA § 101(23)]. And,

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C.A. § 9601(24) [CERCLA § 101(24)]. The broad sweep of what can constitute a "response action" is immediately apparent. The Court thus Interprets the plain language of § 113(f)(3)(B) to give rise to a claim for contribution after a party resolves some or all of its liability to the United States or a State for any "response action," or the costs of such action, that falls under the wide umbrella created by §§ 101(23)-(25),

 If Congress intended to narrow the scope of § 113(f)(3)(B) to cover only settlements that expressly resolve CERCLA liability, it could have done so, as it did in § 113(f)(1), Under that provision, "Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following *any civil action under section 106 or under section 107(a)."* 42 U.S.C. § 9613(f)(1) (emphasis added). The absence of any analogous qualifying language in a provision that creates an alternate basis for a contribution claim—contained within the same subsection—is telling. The Court declines to read into § 113(f)(3)(B) the limiting language that Congress omitted and ASARCO urges, especially since doing so would have the

effect of precluding contribution for a settlement that would otherwise qualify based on its content, but that lacked express reference to CERCLA, This would impede the statute's dual primary purposes, which "are axiomatic; (1) to encourage the 'timely cleanup of hazardous waste sites;' and (2) to "place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition," " W.R. Grace, 559 F.3d 85, 88 (quoting Consol. Edison, 423 F.3d at 94); see also Burlington Northern & Santa Fe Ry. Co. v. U.S., 556 U.S. 599, 602, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009) ("[CERCLA] was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were bourne by those responsible for the contamination") (internal citations and quotation marks omitted). Courts must "construe the statute liberally in order to effect these congressional concerns." Schiavone v. Pearce, 79 F.3d 248, 253 (2d Cir.1996) (citing B.F. Goodrich v. Murtha, 958 F.2d 1192, 1198 (2d Cir.1992)). Contribution is perhaps the primary tool by which parties effectuate CERCLA's second goal, and this Court will not limit that tool given the plain language of §§ 113(f)(1) & (3)(B) and the absence of any supporting evidence of congressional intent. Finally, the Court concurs with the Third Circuit that the passage from the House Report relied upon by the Consolidated Edison court, H.R.Rep. No. 99–253(1) at 79 (1985), refers to § 113(f)(1), not to subsection (f) as a whole, nor to (f)(3)(B) specifically.

For these reasons, the Court holds that Section § 113(f)(3)(B) does not require resolution of CERCLA liability in particular. Instead, that provision gives rise to a contribution claim based upon a judicially approved settlement that resolves a party's liability for some or all of a "response action," as that term is defined in §§ 101(23)-(25), As a result, such a settlement starts the clock on the 3–year statute of limitations imposed by § 113(g)(3)(B), which mirrors the language of § 113(f)(3)(B) stating "[n]o action for contribution for any response costs or damages may be commenced more than 3 years after ... entry of a judicially approved settlement with respect to such costs or damages." 42 U.S.C. § 9613(g)(3)(B).

■ The Court now turns to the consent decrees in order to determine (1) whether the 1998 Decree compelled response actions or costs as defined under CERCLA, and if so, (2) the precise extent to which the actions and costs covered in the 2009 Decree overlap with those covered in the 1998 decree. As the Court has previously stated, the statute of limitations has not run on any new costs covered in the June 5, 2009 consent decree. (Doc. 49 at 5.); see also American Cyanamid Co. v. Capuano, 381 F.3d 6, 15 (1st Cir.2004) ("The entry of a judicially approved settlement provides contribution protection only regarding matters addressed in the settlement and allows a settling PRP to seek contribution within three years of that settlement for costs incurred within the settlement").

■ Upon review of the 1998 Consent Decree, the Court has little difficulty concluding that virtually all of the actions it compels fall into the broad statutory definition of either a "removal" and/or "a remedial" action. The closer and more critical question is whether the 2009 Decree contained any matters not addressed in the 1998 Decree. "The test for determining the extent of 'covered matters' is fact-intensive. 'In determining whether a claim is made regarding matters not addressed in the settlement, a court must consider various factors, including the particular hazardous substance at issue in the settlement, the location or site in question, the time frame covered by the settlement,

and the cost of the cleanup.' " *ASARCO LLC v. Shore Terminals,* 2012 WL 2050253, *7 (N.D.Cal.2012) (not reported in F.Supp.2d) (quoting *United States v. Pretty Products, Inc.,* 780 F.Supp. 1488, 1494–95 n. 4 (S.D.Ohio 1991)).

Atlantic Richfield maintains its long held position that the 1998 Decree established the actions that are to be funded by the $99.294 million ASARCO paid under the 2009 Decree, the purpose of which was to secure the requisite funds prior to ASARCO's discharge in bankruptcy.[3] Atlantic Richfield points to the voluminous discovery materials generated in this case, arguing that the 2009 Decree created no new or additional cleanup obligations with respect to the East Helena Site, but merely constituted a means of funding pre-existing obligations. ASARCO argues that the 2009 Decree requires new actions and costs that fall outside the parameters of the 1998 Decree, primarily related to off-site remediation of groundwater contamination and the broad powers and wide discretion given to the trust it creates and funds.

The Court has scrutinized the extensive materials submitted by both parties. However, the Decrees themselves are clear and comprehensive. They are not ambiguous, and no extrinsic evidence of intent or effect is necessary or appropriate. The contents of those documents compel the conclusion that the 1998 Decree was comprehensive in scope, and that the 2009 Decree memorialized and funded obligations originally established in the 199S Decree in the context of bankruptcy proceedings, ASARCO fails to point to any new actions that the 2009 Decree imposes with respect to the East Helena Site.

ASARCO's primary argument relates to its off-site obligations. ASARCO relies heavily on a provision in the "Background" section of the 1998 Decree which states in full: "WHEREAS, the United States and ASARCO have been engaged in national negotiations to resolve major environmental compliance issues at ASARCO facilities in a cooperative, innovative manner, without the transaction costs associated with protracted litigation." (Doc. 156–12 at 6.) ASARCO claims this is the express purpose of the Decree, and places strong emphasis on the words "at ASARCO facilities" in order to argue that the Decree was limited in scope to include only ASARCO properties. Thus, as its theory goes, contamination—including groundwater contamination—migrating outside the boundaries of ASARCO property falls outside the purpose of the 1998 Decree. The Court will not interpret this prefatory language in the introductory sentence of the Decree to mean that everything that follows applies exclusively to the East Helena land owned by ASARCO. Such an conclusion is not warranted, particularly when viewed in the context of the extensive provisions that follow, many of which implicate contamination outside of the circle ASARCO now wishes the Court to draw. The subsection of the 1998 Decree dedicated to ASARCO's obligations as to corrective actions detail numerous requirements related to investigation, studies, and implementation of corrective measures, all of which were imposed to prevent or mitigate the migration of hazardous materials *"at and/or from the Facility."* (Doc. 156–12 at 26 (emphasis added).) Additionally, the provisions detailing the possible "RFI work plan" contain requirements that apply to the migration of hazardous material

---

**3.** The Court is reassured that its holding in this case will not result in an unfunded cleanup liability. Sufficient funds have been dedicated to this site in the 2009 Decree, thereby

addressing the numerous hazardous substances that have plagued this property and its surroundings since 1888.

"at or from the Facility," and in at least one instance "from the Facility." (*Id.* at 33–34.) The requirements of the corrective measures study ("CMS") are even more externally focused. The CMS is to address "the entire Facility, including areas to which hazardous waste or hazardous constituents have, or may reasonably be expected to migrate beyond the Facility boundaries." (Doc. 156–12 at 38, ¶ 60.) Specifically, ASARCO is to "identify, screen and develop alternatives for removal, containment, treatment, and/or other remediation of releases of hazardous waste or hazardous constituents, at or migrating from the facility." (*Id.* at ¶ 62.) Thus, the plain language of the 1998 Decree simply cannot support ASARCO's position on this point.

ASARCO also contends that these "scattered references to the performance of off-site remediation activity" are limited to obligations to study and investigate such activity, and not act, claiming that the $99.24 million groundwater remediation project at the heart of Montana's subsequent CERCLA claim was thus outside the parameters of the 1998 Decree. (Doc. 161 at 26.) However, the Decree describes the painstaking process by which the EPA, ASARCO, and the public at large will ultimately settle on what is to be done after all the studies and investigations of contamination at or from the Facility are completed. (Doc. 156–12 at 43–46). After seemingly endless rounds of comment, revision, and approval "ASARCO shall commence work to implement the tasks required" by the resulting document. (*Id.* at 46, ¶ 82.) Thus, while the precise contours of the specific remedial actions are ultimately to be established through the exhaustive process established in the 1998 Decree, the Decree itself clearly addresses liability and remedial actions pertaining not just to ASARCO's Facility, but to contamination that has migrated from that facility, including to the groundwater (Doc.

156–12 at 40, ¶ C). The 1998 Decree anticipates sweeping remedial actions that ASARCO is obligated to undertake.

The Court now turns to the June 2009 Decree to determine what response actions or costs (or, as the parties refer to it generally, "new work"), if any, it requires that were not covered in the 1998 Decree. ASARCO's main argument is based on the $99 million pump-and-treat groundwater remedy executed by METG pursuant to its authority under the 2009 Decree, This is the only "new" work that ASARCO contends is required under the 2009 Decree. However, the Decree only requires the "payment of $99.294 million to fund future Environmental Actions and certain future oversight costs of the Governments with respect to the East Helena Designated Property." (Doc. 159–4 at 19.) It makes no specific mention of how the money is to be spent, and does not mention a pump-and-treat system. That is, the 2009 Decree does not mention groundwater, nor does it require the Trust to spend the $99.294 million on a pump-and-treat system. Thus, the Court concludes from its reading of the two consent decrees that the only work the Trust is required to perform and fund under the 2009 Decree are the pre-existing obligations ASARCO had yet to complete under the previous agreements, including primarily the 1998 Decree, Stated simply, there was no "new" work created by the 2009 Decree.

### Conclusion

Because ASARCO failed to file a claim for contribution within three years of the 1998 consent decree, its contribution action now before the Court is time-barred pursuant to CERCLA Section 113(g)(3)(B). The 2009 consent decree does not create any additional work or liability as to the East Helena Site outside of the 1998 consent decree, and ASARCO has failed to raise any genuine issue for trial.

As a final matter, ASARCO has filed a motion to strike materials referenced in and attached to Atlantic Richfield's reply brief on its motion for summary judgment (Docs. 180–1, 180–2, 180–3), Because these materials had no bearing on the Court's decision on the motion for summary judgment, the motion to strike will be denied as moot.

IT IS ORDERED that:

(1) Plaintiff ASARCO's motion to strike (Doc. 181) is DENIED as moot;

(2) Defendant Atlantic Richfield's motion for summary judgment (Doc. 153) is GRANTED;

(3) This case is DISMISSED, and the Clerk of Court is directed to enter judgment in favor of Defendant Atlantic Richfield Company.