Niagara Mohawk v. Consolidated Rail

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: June 9, 2009        Decided: February 24, 2010)

Docket Nos. 08-3843-cv (L); 08-4007-cv (XAP)

_____

Niagara Mohawk Power Corporation,

*Plaintiff-Appellant-Cross-Appellee*,

–v.–

Chevron U.S.A., Inc.,

*Defendant-Appellee-Cross-Appellant*,

United States Steel Company, Richard B. Slote, in his
capacity as personal representative of the estate of Edwin
D. King, and Portec, Inc.,

*Defendants-Appellees-Cross-Appellees*,

King Services, Inc., Richard B. Slote, and Lawrence King,

*Defendant-Cross-Appellees*,

County of Rensselaer and The County of Rensselaer Sewer
District No. 1,

*Third-Party-Defendants-Cross-Appellees*,

Consolidated Rail Corporation, American Premier
Underwriters, Inc., The Foundation Company and Pittsburgh

Business,

*Defendants*.

_____

Before:
CALABRESI, WESLEY, *Circuit Judges*, and VITALIANO,[*] *District Judge*.

Niagara Mohawk Power Corporation ("NiMo") commenced this action to recover costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub. L. No. 96-510, 94 Stat. 2767, and the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613, codified together at 42 U.S.C. §§ 9601-75, from the defendants for cleanup of properties previously owned by NiMo and once either owned, leased, or used by the defendants.  In this appeal, NiMo challenges orders of the United States District Court for the Northern District of New York (Hurd, J.) denying NiMo's motion for summary judgment, granting summary judgment in favor of the defendants, and denying NiMo's motion for reconsideration.

We are called upon to determine whether NiMo, as a potentially responsible party under CERCLA, can seek response and cleanup costs under either § 107(a)(4)(B) or § 113(f)(3)(B), after having settled its CERCLA liability with the New York State Department of Environmental Conservation ("DEC") but not with the Environmental Protection Agency ("EPA"), where the EPA has not expressly authorized the DEC to settle CERCLA liability relating to the property at issue.  We hold that NiMo may seek contribution costs under § 113(f)(3)(B) because NiMo has settled with the DEC, but consequently NiMo may not seek reimbursement for response costs under § 107(a).  We hold that the district court erred in granting summary judgment for the defendants because there are genuine issues of

[*] The Honorable Eric N. Vitaliano, of the United States District Court for the Eastern District of New York, sitting by designation.

material fact with regards to their respective liabilities. We hold that the district court erred by holding that NiMo did not comply with the National Continency Plan. We hold that the district court erred in part by dismissing NiMo's New York Navigation Law claims. Finally, we hold that the district court erred in dismissing Chevron's third party action against the County of Rensselaer and others.

We affirm, however, the district court's dismissal of NiMo's state contribution, indemnity, and unjust enrichment claims because they are preempted by CERCLA.

AFFIRMED in part and REVERSED in part.

---

JOHN T. PARKINSON, Syracuse, NY (Thomas R. Lotterman, Robert V. Zener, Milissa A. Murray, Sandra P. Franco, Bingham McCutchen LLP, Washington, DC, *on the brief*), *for Plaintiff-Appellant-Cross-Appellee Niagara Mohawk Power Corporation*.

PATRICK J. HIGGINS, Powers & Santola, LLP, Albany, NY, *for Defendant-Appellee-Cross-Appellant Chevron U.S.A., Inc.*

KEVIN C. MURPHY, The Wladis Law Firm, Syracuse, NY (David L. Smiga, *on the brief*, Pittsburgh, PA), *for Defendant-Appellee-Cross-Appellee United States Steel Corporation.*

KIMBERLEE S. PARKER, Bond, Schoeneck & King, PLLC, Albany, NY, *for Defendant-Appellee-Cross-Appellee Portec, Inc.*

---

WESLEY, *Circuit Judge*:

This case is yet another in a series of cases that attempt to chart the contours of liability of a potentially responsible party ("PRP") under §§ 107(a)(4)(B) and

113(f)(3)(B) for contribution towards, and payment of, costs resulting from the identification and cleanup of hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub. L. No. 96-510, 94 Stat. 2767, and the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613, codified together at 42 U.S.C. §§ 9601-75. We hold that the PRP seeking contribution in this case, Niagara Mohawk Power Corporation ("NiMo"), may seek contribution under § 113(f)(3)(B) from certain of the PRPs — Chevron U.S.A., Inc. ("Chevron"), United States Steel Corporation ("U.S. Steel"), Portec, Inc. ("Portec"), and Edwin D. King ("King") — because New York's Department of Environmental Conservation ("DEC") could agree to settle NiMo's CERCLA liability without express authorization by the Environmental Protection Agency ("EPA"). However, because NiMo incurred response costs as a result of a resolution of its CERCLA liability with the DEC, NiMo cannot seek recovery costs under § 107(a)(4)(B).

We also hold that the district court erred in granting summary judgment to U.S. Steel, Chevron, Portec, and King because there are genuine issues of material fact as to

their liability.  The district court erred in finding that NiMo did not comply with the National Contingency Plan.  We reverse in part the district court's dismissal of NiMo's Navigation Law contribution claim.  We affirm the district court's dismissal of NiMo's state contribution, indemnification, and unjust enrichment claims as preempted under CERCLA.  Finally, we reverse the district court's dismissal of Chevron's third-party action against the County of Rensselaer and others.

**I.  BACKGROUND**

At the center of this dispute is a contaminated site in Troy, New York — known as the Water Street Site — that over the last 100 years has played host to various industrial activities including a coke[1] plant, a steel manufacturing facility, a manufactured gas plant, and a petroleum distribution facility.  Each use led to the release or disposal of toxic substances, many subject to liability under CERCLA.

NiMo owned portions of the Water Street Site either directly or through a predecessor from 1922 until 1951.  During this period, NiMo continued to operate a pre-existing

---

[1] Coke is a residue of coal left after distillation.

manufactured gas plant on the Site.  Coal tar, which contains hazardous substances covered by CERCLA, is a typical waste that results from the production of manufactured gas and has been found on the Site.  By 1951, NiMo had conveyed most of its interest at the Site to Republic Steel, and today owns only a small parcel used as a natural gas regulator station.

In December of 1992, NiMo entered into an Order on Consent with the DEC that required NiMo to investigate twenty-one sites in New York that once had hosted manufactured gas plants to determine the nature and extent of the hazardous materials present.  The purpose of the Order was to "control and/or remove residual [manufactured gas plant] waste sources."  NiMo agreed to develop and implement plans for remediation of the pollution under the direction of the DEC.  For each site, NiMo developed and implemented a Preliminary Site Assessment that provided data necessary for the DEC to determine whether the hazardous substances present on the site posed a threat to the public or the environment, and thus required remediation.  Any site identified by the Preliminary Site Assessment as requiring comprehensive evaluation was then subject to a Remedial

Investigation conducted by NiMo, which consequently prepared a Feasibility Study.  NiMo agreed to remediate sites the DEC deemed in need.  In 2003, NiMo and the DEC executed an amended Order on Consent under which NiMo incurred additional costs while obtaining a specific release of CERCLA liability upon meeting certain conditions.

Both Orders included the Water Street Site.  As NiMo learned, the hazardous byproducts of the commercial activities conducted on the Site lasted far longer than the industries themselves.  For purposes of the assessments, reports, and remediation, the DEC divided the property into four parts, corresponding to historical ownership and property lines.[2]

In its Preliminary Site Assessment for Area 1, NiMo concluded that no remedial investigation or feasibility study need be done based on the few hazardous materials found.  NiMo did take some action in Area 1, however; it removed some tar and continued to monitor Area 1 for any new tar leaks.

Investigation of Area 2 revealed significant

---

[2] A map of the Water Street Site is provided at Appendix A.

contamination. In addition to hazardous materials in the soil and groundwater, NiMo discovered evidence of hazardous materials in the sediment of the Wynantskill Creek, which runs through Area 2. NiMo prepared a Final Feasibility Study Report evaluating remedial options for the area; the Report and its recommendations await a final DEC decision.

After its review of Area 3, NiMo requested that Area 3 be deleted from the remediation plan because the only manufactured gas plant activity on Area 3 would not have produced hazardous materials. The DEC agreed only to postpone any investigation of Area 3, fearing that Area 3 may have some contamination from nearby Hudson River deposits.

Area 4 had substantial contamination in its soil and sediments. The DEC approved a remediation plan that included excavation, placement of an impermeable cap over the area, certain use restrictions for the property, and future monitoring.

NiMo began this action on July 1, 1998,[3] seeking to recoup its CERCLA costs and seeking to recover under a

_____

[3] NiMo filed an amended complaint on May 26, 1999, adding defendants.

number of state law claims. Defendants counterclaimed and cross-claimed for contribution; the parties ultimately moved for summary judgment. In its first opinion in November of 2003, the district court thoroughly recounted the complicated facts of the case and disposed of a number of matters. *Niagara Mohawk Power Corp. v. Consol. Rail Corp.* ("*Niagara I*"), 291 F. Supp. 2d 105 (N.D.N.Y. 2003). On November 7, 2003, the day after the district court's opinion in *Niagara I*, the 2003 Order of Consent was executed. That Order was "intended to supercede and replace" the 1992 Consent Order. NiMo agreed to continue the remediation of the sites. Under the terms of the agreement, NiMo "resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2)."

Over the next five years, the case came to our Court twice. Prior to our decisions in each appeal, the United States Supreme Court issued a major decision involving CERCLA issues that directly affected the appeal then before us and required us to remand the matter to the district court for reconsideration. This decision is the culmination

of the case's third visit to 500 Pearl Street.[4]

## II. CERCLA

Enacted in response to New York's Love Canal disaster,[5] CERCLA was designed, in part, to "assur[e] that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions."  S. Rep. No. 96-848, at 13 (1980).  CERCLA, remedial in nature, is designed to encourage prompt and effective cleanup of hazardous waste sites.  *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197-98 (2d Cir. 1992).  CERCLA empowers the federal government and the states to initiate comprehensive

---

[4] The Court is currently housed at the Moynihan Federal Courthouse at 500 Pearl Street, a "temporary" location of now some five years.

[5] In the late 1930s or early 1940s, the Hooker Chemical Company began dumping toxic waste in an abandoned canal near Niagara Falls.  Michael H. Brown, *Love Canal and the Poisoning of America*, The Atlantic Monthly, Dec. 1979, at 33.  In 1953, the canal was filled and sold to the city to provide land for a new elementary school and playground. *Id*.  Families moved into the area, unaware that the large field behind their homes was teeming with toxic waste. *Id*. Despite evidence of contamination, it took until 1978 for New York State and the federal government to investigate the pervasive health problems affecting the residents and the deterioration of buildings around the Love Canal.  S. Rep. No. 96-848, at 8-10 (1980).  Ultimately, it was determined that thousands of tons of toxic waste contaminated the area around Niagara Falls, creating an "environmental ghetto[]" that then-President Carter declared a federal emergency. *Id*.

cleanups and to seek recovery of expenses associated with those cleanups.  Somewhat like the common law of ultra-hazardous activities, property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there.  *See New York v. Lashins Arcade Co.*, 91 F.3d 353, 359 (2d Cir. 1996); *see also Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 301-02 (2d Cir. 1996).  Owners can escape liability only if the pollution results from an act of God or an act of war, or if the owners establish they are "innocent owners" under the statute.  42 U.S.C. § 9607(b); *see also* Michael B. Gerrard & Joel M. Gross, *Amending CERCLA: The Post-SARA Amendments to the Comprehensive Environmental Response, Compensation, and Liability Act* 54 (2006).

CERCLA does provide property owners an avenue of reprieve; it allows them to seek reimbursement of their cleanup costs from others in the chain of title or from certain polluters — the so-called potentially responsible parties ("PRP"s).[6]  42 U.S.C. § 9607(a).  This reprieve is

---

[6] Under CERCLA, a potentially responsible party (PRP) is defined as:

available through three separate provisions, namely §§ 107, 113(f)(1), and 113(f)(3)(B).  Section 107 authorizes the United States, a state, or "any other person" to seek reimbursement for all removal or remedial costs[7] associated

(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).

[7] "Removal" under CERCLA means:

[T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluated the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).

with the hazardous materials on the property, provided that those actions are consistent with the National Contingency Plan — the federal government's roadmap for responding to the release of hazardous substances. *Id*. § 9607(a)(4). The language "any other person" includes a PRP that voluntarily cleans the site. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 135-36 (2007). Section 113(f)(1) provides PRPs who have been sued under § 107 a right of contribution from other PRPs, including the plaintiff. *Id*. at 139. Section 113(f)(3)(B) also provides a right of contribution to PRPs that have settled their CERCLA liability with a state or the United States through either an administrative or judicially approved settlement. 42 U.S.C. § 9613(f)(3)(B). In allocating the response costs among the parties, the statute instructs the court to use "such equitable factors as the court determines are appropriate."

---

"Remedial action[s]" mean:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24).

*Id.* § 9613(f)(1).

Section 107 allows for complete cost recovery under a joint and several liability scheme; one PRP can potentially be accountable for the entire amount expended to remove or remediate hazardous materials.[8] *See Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006). When CERCLA was first enacted, this was the only remedy available. Courts struggled with whether PRPs (themselves liable for some of the cleanup) could invoke § 107 for contribution from other PRPs for their proportionate share of the costs as opposed to full cost recovery. *See Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994). In the absence of express language, some courts filled in the obvious gap and recognized a common law right to contribution between PRPs. *Id.* Congress finally provided the express language necessary to authorize a contribution right under CERCLA

---

[8] A number of courts, including ours, have noted that while § 107(a) permits recovery of all remedial costs, it does not preclude a defendant PRPs from asserting counterclaims (or cross-claims) for contribution under § 113(f)(1), effectively converting the § 107(a) action into an apportionment of liability among jointly *and* severally liable parties. *See Consol. Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 100 n.9 (2d Cir. 2005); *see also Atl. Research*, 551 U.S. at 140.

with the Superfund Amendments and Reauthorization Act of 1986, adding § 113 to the statutory scheme.  Pub. L. No. 99-499, 100 Stat. 1613, 1647-48.

Supreme Court jurisprudence exploring the nature of the relationship between these statutory provisions developed simultaneously with the district court's decisions in the case before us.  After the district court's first decision, the Court issued the first of two opinions attempting to clarify the interaction between §§ 107 and 113.  First, in 2004, the Court determined that a private party who had not been sued under § 106 or § 107(a) could not assert a claim for contribution under § 113(f)(1) from other PRPs.  *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 160-61 (2004).  Looking to the text of § 113(f)(1), the Court concluded that contribution was only available "during or following" an action under § 106 or § 107.  *Id*. at 165-66. The plaintiff had remediated the hazardous material voluntarily, without the judicial spur of § 106 or § 107, and thus was not eligible to sue other PRPs for contribution.  *Id*. at 168.  Because the parties had not briefed the issue, the Court expressly refused to decide whether the plaintiff could have sued under § 107.  *Id*. at

169-70.

After *Cooper Industries*, we remanded *Niagara I* back to the district court for reconsideration in light of that decision. *Niagara Mohawk Power Corp. v. Consol. Rail Corp.* ("*Niagara II*"), 436 F. Supp. 2d 398, 399-400 (N.D.N.Y. 2006). In *Niagara II*, NiMo correctly conceded that it could not proceed with a contribution claim under § 113(f)(1) — it had not been sued under § 106 or § 107(a). *Id.* at 400-01. NiMo argued, however, that it could seek contribution under § 113(f)(3)(B) because it had resolved its CERCLA liability in the 2003 Consent Order. *Id.* at 401. The district court disagreed. It concluded that because the DEC had not been granted authority to settle CERCLA claims by the EPA, the settlement did not qualify under § 113. *Id.* at 402. The district court viewed the consent orders as reaching only state law-based liability.[9]

---

[9] The district court also ruled that NiMo could not invoke § 107(a) as a basis for its claims. *Niagara II*, 436 F. Supp. 2d at 403. The court relied on pre-*Cooper Industries* Circuit precedent, *Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir. 1998), that had required settling PRPs to employ § 113(f). *Id.* That holding was abandoned — at least as to the inability of a settling PRP to use § 107(a) — by our decision in *W.R. Grace & Co. — Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 90 (2d Cir. 2009). *W.R. Grace* was decided *after* the district court's decision in *Niagara II*.

After *Niagara II*, in 2007, the Supreme Court addressed the unanswered question from *Cooper Industries*.  *See Atl. Research*, 551 U.S. at 131 (2007).  The Court read "any other necessary costs of response incurred by *any other person*" in § 107(a)(4)(B) as authorizing claims against other PRPs by private parties that incurred response costs.  *Id*. at 135-37.  The Court differentiated joint and several liability claims under § 107 from contribution claims under § 113, identifying each as distinct "causes of action [available] to persons in different procedural circumstances."  *Id*. at 139 (internal quotation marks omitted).  Section 107, the Court explained, is available for parties that have incurred actual response costs, while § 113(f) is available for parties that have reimbursed those response costs to others.[10]  *Id*.

---

*See Niagara II*, 436 F. Supp. 2d at 398.  As a result of the district court's two rulings, NiMo was left with no federal right of contribution at all.

[10] The Court looked to the common law understanding of contribution in defining that term as used in § 113(f): "the tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault."  *Atl. Research*, 551 U.S. at 138 (quoting *Black's Law Dictionary* 353 (8th ed. 2004)) (internal quotation marks omitted).

We remanded *Niagara II* in light of *Atlantic Research*. *Niagara Mohawk Power Corp. v. Consol. Rail Corp.* ("*Niagara III*"), 565 F. Supp. 2d 399, 400 (N.D.N.Y. 2008). The district court in *Niagara III* concluded that *Atlantic Research* necessitated no change in the court's previous determinations and reaffirmed its prior rulings. *Id*. at 403. Once again the case is before us.

**A.    Niagara's Recovery Costs**

Pursuant to its agreement with the DEC, NiMo incurred costs to investigate and remediate the Water Street Site. NiMo sought repayment of those costs from the defendants under a theory that the defendants were PRPs as a result of their status as owners of portions of the site and also as a result of certain actions each took on their respective properties — storing leaking drums, demolition of industrial facilities, disposal of hazardous substances on site — all of which allegedly resulted in the presence of hazardous substances on the Water Street property.

**1.    2003 Consent Order**

Before the district court, NiMo sought to recover the costs of its remediation efforts under § 107 or, alternatively, under § 113(f)(1). Following the first

remand, NiMo conceded that it was not entitled to seek contribution under § 113(f)(1) because it had not been subject to a civil action under § 106 or § 107. *Niagara II*, 436 F. Supp. 2d at 401. However, NiMo argued it was entitled to contribution under § 113(f)(3)(B) because the 2003 Consent Order qualified as an administrative settlement. *Id.* The court refused to consider the 2003 Consent Order.[11] *Id.*

The parties argue quite vigorously over whether the 2003 Consent Order is before us. Chevron and Portec stress that the district court's decision to not consider the 2003 Consent Order was not an abuse of discretion and that our earlier refusal to add the Order to the record on appeal of *Niagara I* supports that view.

Chevron and Portec are right about the standard of review, but wrong about the result. We review a district court's decision whether to reopen the record to admit new evidence for abuse of discretion. *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 674, 679 (2d Cir. 1998). A district

---

[11] Having dismissed NiMo's federal claims, the district court then declined to exercise supplemental jurisdiction over NiMo's unjust enrichment claims. *Niagara II*, 436 F. Supp. 2d at 403.

court has abused its discretion if its ruling is "based . . . on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or [if the district court] rendered a decision that cannot be located within the range of permissible decisions."  *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks and citations omitted).  In our view the district court abused its discretion by failing to admit the 2003 Consent Order.

Upon our remand of *Niagara I* to the district court to reconsider its decision in light of *Cooper Industries*, NiMo attempted to admit the 2003 Consent Order by attaching the Order to an attorney's affidavit submitted to the district court with NiMo's brief on the effect of *Cooper Industries* on the case.  The district court rejected the 2003 Consent Order as not part of the record and noted that no motion to supplement the record had been made.  *Niagara II*, 436 F. Supp. 2d at 401.  The district court added the following comments in a footnote: "The Amended Consent Order is an attachment to an attorney affidavit submitted in support of Niagara Mohawk's brief on remand, *but was not included (or for that matter mentioned) in any prior proceedings*, which have been ongoing since 1998.  It is also noted that Niagara

Mohawk sought permission in the Second Circuit to supplement the record on appeal with the Amended Consent Order. Permission was denied." *Id*. at 401 n.3 (emphasis added).

Our initial denial of NiMo's request to include the 2003 Consent Order in the record of the first appeal makes sense to us; the Consent Order was not before the district court in *Niagara I*. *See Int'l Bus. Mach. Corp. v. Edelstein*, 526 F.2d 37, 44 (2d Cir. 1975) ("[A]bsent extraordinary circumstances, federal appellate courts will not consider rulings or evidence which are not part of the trial record."). That ruling was not premised on NiMo's mistake but on impossibility; the 2003 Consent Order could not have been before the district court as it had not been fully executed until after the district court's first decision. *See Niagara I*, 291 F. Supp. 2d at 105; *see also Niagara II*, 436 F. Supp. 2d at 401. But, in these circumstances, our conclusion with regard to what was before our court should not have been dispositive or, frankly, even considered by the district court when faced with the decision to admit the document on remand. As soon as the district court regained jurisdiction following the remand, NiMo attempted to admit the document with its first

submission. The district court's notation that the Order had not previously been included in the record is technically correct but overlooks the obvious — it could not have been a part of the record as it did not exist. Moreover, the district court's comment that the case had been on-going since 1998 was of no moment; NiMo presented the 2003 Consent Order at the first opportunity it had to do so. And, although NiMo did not make a formal motion to supplement the record, there is no evidence that any of the defendants made a formal motion to strike the document or even disputed its authenticity.[12] The district court penalized only NiMo for a trivial procedural shortcoming; this was error.

## 2. Section 113(f)(3)(B) Claims

In our view, only § 113(f)(3)(B) provides the proper procedural mechanism for NiMo's claims. Under § 113(f)(3)(B), a "person who has resolved its liability to

---

[12] Even if the district court had not abused its discretion in failing to admit the 2003 Consent Order, we are empowered to take judicial notice of the 2003 Consent Order, as it is a public record. *See, e.g.*, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Thus, on multiple grounds, we conclude that the 2003 Consent Order is a part of the appellate record and may be considered in our analysis.

the United States or a state for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement."  42 U.S.C. § 113(f)(3)(B).  As noted, the district court determined that this provision did not apply to NiMo because NiMo settled with the DEC, and the EPA had not formally delegated power to settle CERCLA claims to the DEC.  *Niagara II*, 436 F. Supp. 2d at 402.  In the district court's view, the settlement did not resolve NiMo's liability under CERCLA and thus, NiMo was not entitled to contribution.  *Id*. at 404.

Some of our earlier cases could be mistaken for supporting the district court's view.  In *Consolidated Edison*, we held that a utility ("ConEd") that entered into a "Voluntary Cleanup Agreement" with the DEC could not seek contribution from another PRP under § 113(f)(3)(B) because the Voluntary Cleanup Agreement by its terms only absolved ConEd of state liability and did not reference CERCLA.[13]

_____

[13] Under the Voluntary Cleanup Agreement, the DEC "release[d], covenant[ed] not to sue, and . . . fore[went] from bringing any action, proceeding, or suit pursuant to the [New York] Environmental Conservation Law, the Navigation Law or the State Finance Law, and from referring

*Consol. Edison Co. v. U.G.I. Util., Inc.*, 423 F.3d 90, 97 (2d Cir. 2005). The Voluntary Cleanup Agreement indicated that DEC would "not take any enforcement action under . . . CERCLA," but DEC promised to refrain from doing so only "to the extent that [the existing] contamination [at issue] is being addressed under the Agreement." *Id.* at 97. The state agency also reserved the "right to take any investigatory or remedial action deemed necessary as a result of a significant threat resulting from the Existing Contamination or to exercise summary abatement powers." *Id.* at 96-97. We held that the rights reserved by the DEC "[left] open the possibility that the [DEC] might still seek to hold ConEd liable under CERCLA" and therefore, because ConEd could still be sued under CERCLA, it was not entitled to bring an action under § 113(f)(3)(B).[14] *Id.* at 97.

to the Attorney General any claim for recovery of costs incurred by the [DEC] . . . for the further investigation and remediation of the Site, based upon the release or threatened release of Covered Contamination." *Consol. Edison*, 423 F.3d at 96.

[14] This Court noted but did not resolve the issue again in *Schaefer v. Town of Victor*, 457 F.3d 188, 202 n.19 (2d Cir. 2006) ("[W]e need not decide whether the . . . Consent Judgment [at issue] constitutes a judicially approved settlement . . . .").

In *W.R. Grace & Co.– Conn. v. Zotos Int'l, Inc.*, we held that a PRP could not bring an action for contribution against another PRP under § 113(f)(3)(B) based on its settlement with the DEC because the DEC settlement "ma[de] no reference to CERCLA, [and] establishe[d] that the DEC settled only its state law claims against [the PRP], leaving open the possibility that the DEC or the EPA could, at some future point, assert CERCLA or other claims." 559 F.3d 85, 91 (2d Cir. 2009). Specifically, the consent order at issue provided that, "[i]f the [DEC] acknowledges that the implementation is complete . . . such acknowledgment shall constitute a full and complete satisfaction and release of each and every claim, demand, remedy or action whatsoever against [the PRP], its officers and directors, which the [DEC] has or may have as of the date of such acknowledgment pursuant to Article 27, Title 13, of the [New York Environmental Conservation Law] relative to or arising from the disposal of hazardous or industrial waste at the Site." *Id.*

In each case, the consent order at issue did not purport to resolve CERCLA liability and hence, in the panel's view, did not qualify as an administrative

settlement under § 113.  But neither *Consolidated Edison* nor *W.R. Grace* held that the DEC was without authority to settle CERCLA claims nor did either case conclude that CERCLA settlement authority required explicit authorization from the EPA.  *See W.R. Grace*, 559 F.3d at 90-91; *Consol. Edison*, 423 F.3d at 95-97.  Moreover, unlike the consent agreements in *Consolidated Edison* and *W.R. Grace*, the 2003 Consent Order specifically released NiMo from CERCLA liability.  The 2003 Consent Order released NiMo from liability under "[f]ederal statutory . . . law involving or relating to investigation or remedial activities relative to or arising from the disposal of hazardous wastes or hazardous substances . . . at the [Water Street Site]" and "resolved [NiMo's] liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2)[, 42 U.S.C. § 9613(f)(2)]."  Under the 2003 Consent Order, the remedial activities performed by NiMo were consideration for "a release and covenant not to sue . . . which [DEC] has or may have pursuant to . . . State or Federal statutory or common law involving or relating to investigative or remedial activities relative to or arising from the disposal of hazardous wastes or hazardous substances."  Once NiMo

completed the Consent Order responsibilities, NiMo was "deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2)" and thus was "entitled to seek contribution." The 2003 Consent Order qualifies as an administrative settlement of liability for purposes of CERCLA pursuant to the plain text of § 113(f)(3)(B).

Our interpretation of the Consent Order fits squarely within the type of contribution claims contemplated by § 113. The provisions of the statute come into play once NiMo resolved its liability to the "United States *or* a State." 42 U.S.C. § 9613(f)(3)(B) (emphasis added). The statute does not require that the United States acquiesce in the administrative settlement — it does not read the "United States *and* a State." Nor does § 113(f)(3)(B) require that there be a federal delegation of settlement authority to a state — the statute does not say the "United States or a State *with the express authority of the United States*." But the district court's interpretation of the statute would compel such a result. If Congress wanted to constrict the authority of state environmental agencies in settling CERCLA claims, it could have easily done so. Instead, Congress

chose the disjunctive and established a dual track for the resolution of CERCLA liability.

As the EPA's amicus brief points out, "[b]ecause of the number and variety of contaminated sites across the country, states play a critical role in effectuating the purposes of CERCLA."[15] Brief for United States as Amicus Curiae Supporting Appellant at 4, *Niagara Mohawk v. Consol. Rail*, Nos. 08-3843-cv; 08-4007-cv (2d Cir. 2009)   That role is not only critical, it is autonomous.  For instance, the EPA

---

[15] The EPA brief understandably takes issue with our holding in *Consolidated Edison.*

> The United States was not a party to *Consolidated Edison* and believes it was not correctly decided. Section 113(f)(3)(B) applies where a PRP 'has resolved its *liability to* . . . a State for some or all of a response action or for some or all of the costs of such action.' 42 U.S.C. § 9613(f)(3)(B). The settlement of federal and state law claims other than those provided by CERCLA fits within § 113(f)(3)(B) as long as the settlement involves a cleanup activity that qualifies as a 'response action' within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).

Brief for United States as Amicus Curiae Supporting Appellant at 15, *Niagara Mohawk v. Consol. Rail*, Nos. 08-3843-cv; 08-4007-cv (2d Cir. 2009) (emphasis added).  While there is a great deal of force to this argument given the language of the statute, we need not resolve the *Consolidated Edison / W. R. Grace* problem as the language of the 2003 Order clearly encompasses CERCLA liability and our cases have never precluded the state agency from resolving CERCLA claims.

must coordinate with an affected state before deciding on an appropriate remedial action, and, under § 128, the EPA may award a grant to a state that has a response program that conforms to the requirements of CERCLA. 42 U.S.C. §§ 9604(c), 9628(a). The EPA is expressly authorized to enter into contracts or agreements with states to carry out CERCLA response actions. 40 C.F.R. § 300.515(a)(1).

Under CERCLA, states have causes of action independent from the federal government. For example, under § 107, a PRP is liable for clean up costs "incurred by the United States Government or a state." 42 U.S.C. § 9607(a)(4)(A). We have previously held that a state does not need the approval of the United States before it can remediate hazardous substances and sue PRPs under § 107. *See N.Y. v. Shore Realty Corp.*, 759 F.2d 1035, 1047-48 (2d Cir. 1985). CERCLA views the states as independent entities that do not require the EPA's express authorization before they can act. New York is empowered to settle a PRP's CERCLA liability. The 2003 Consent Order between NiMo and the DEC qualifies as "an administrative or judicially approved settlement" under § 113(f)(3)(B); NiMo is entitled to seek contribution under CERCLA.

### 3.    Section 107(a) Claim

NiMo contends that it may also have a claim under § 107(a).[16]  Section 107(a) claims are brought by federal or state agencies that have incurred response costs or PRPs who incur CERCLA clean up costs without judicial or administrative intervention.[17]  *See Atl. Research*, 551 U.S. at 135.  Section 113(f)(3)(B) claims seek proportionate reimbursement from other PRPs of cleanup costs for a PRP that has resolved its CERCLA liability for some or all of the costs of a response action through a judicial or agency-approved settlement.  *See* 42 U.S.C. § 9613(f)(3)(B). Clearly, the two sections have differing restrictions and

---

[16] While we normally would not consider an alternative basis for recovery once we have decided another section of a statute provides one, this is far from a normal case.  Given the twists and turns the litigants and the law has experienced over the past eleven years, we think it time to address all of the parties' arguments.

[17] In *Atlantic Research*, the Supreme Court left open the question of when an action for cost recovery under § 107(a) may be available to a PRP that directly incurs clean up costs under some judicial or administrative compulsion.  *See Atl. Research*, 551 U.S. at 139 n.6.  We similarly do not decide whether a § 107(a) action could be pursued by a PRP that incurs clean up costs after engaging with the federal or a state government, but is not released from any CERCLA liability.

different purposes.[18]  Moreover, § 113(f) was enacted by Congress as part of SARA to amend CERCLA for the purpose of codifying the contribution remedy that most courts had already read into the statute.  It was designed to "clarif[y] and confirm . . . the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the [PRP] believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances."  H.R. Rep. No. 99-253(I), at 79 (1985).

NiMo's claim fits squarely within the more specific requirements of § 113(f)(3)(B).  NiMo acknowledged

---

[18] To the extent that NiMo seeks recovery of its actual response costs and does not seek reimbursement from others for response costs it disproportionately paid to a third party, NiMo's claims do not seem to fit the common law definition of contribution that the Supreme Court employed in defining the statutory term in *Atl. Research*.  The *Atl. Research* Court, however, recognized that there could be an overlap of the *concepts* of cost recovery and contribution. *Atl. Research*, 551 U.S. at 139 n.6.  NiMo was partially responsible for the contamination at the Water Street Site. It avoided a state or federal cleanup of the Site and a subsequent suit by New York or the United States under § 107(a) for reimbursement of those costs by entering into the Consent Orders.  NiMo in essence financed the cleanup. While NiMo's claims might fall within "the overlap"of the concepts of cost recovery and contribution recognized by *Atl. Research*, "concepts" do not alter the plain language of the statute in play here.  NiMo's claims clearly meet the more specific parameters of the terms of § 113(f)(3)(B).

responsibility and paid for response costs under the statute.  NiMo settled its CERCLA liability with DEC by agreeing to identify and to remediate some of the hazardous substances present at the Water Street Site.  NiMo presses a claim for a sharing of those costs with other PRPs consistent with § 113(f)(3)(B).  The EPA in its amicus brief strongly argues that § 113(f)(3)(B) is the proper vessel for NiMo's contribution claims in light of its more specific requirements, the nature of NiMo's claims, and the amendment of the statute to provide the right of contribution.  We agree.  Congress recognized the need to add a contribution remedy for PRPs similarly situated to NiMo.  To allow NiMo to proceed under § 107(a) would in effect nullify the SARA amendment and abrogate the requirements Congress placed on contribution claims under § 113.[19]  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  *Stone v. INS*, 514 U.S. 386, 397 (1995).

**III.     SUMMARY JUDGMENT**

In *Niagara I*, the district court denied NiMo's motion

---

[19] Claims under § 107 do enjoy a six-year statute of limitations while claims under § 113 have a three-year statute of limitations.  42 U.S.C. § 9613(g).

for summary judgment with respect to King Service and granted summary judgment for U.S. Steel and Portec, and partial summary judgment for Chevron. *Niagara I*, 291 F. Supp. 2d at 140-41. The district court found that although King was the current owner of Area 2 — and failed to provide evidence that it engaged in the appropriate inquiry when it purchased the property in 1968 to qualify for the innocent owner defense under 42 U.S.C. § 9601(35)(B) — there was a genuine issue of material fact as to whether response costs incurred by NiMo were consistent with the National Contingency Plan. *Niagara I*, 291 F. Supp. 2d at 128.

With respect to U.S. Steel, the district court found that NiMo's expert testimony that U.S. Steel had released hazardous substances onto the Water Street Site during the time U.S. Steel owned the property prior to 1922 was speculative. *Id.* at 129. The district court concluded that NiMo had failed to raise a genuine issue of material fact as to whether hazardous substances were released when U.S. Steel owned the property. *Id.* at 130.

With respect to Chevron, the district court first determined that although the DEC had suspended its investigation of Area 3, which Chevron currently owns,

Chevron was a PRP because the entire Water Street Site, including Area 4 that Chevron had also owned, remained at issue in the case. *Id*. at 131. However, the district court found that NiMo had not provided any evidence to support its claim that Republic, Chevron's tenant on Area 4 when Chevron owned that portion of the property, had dispersed hazardous materials. *Id*. at 134. Therefore, the district court held Chevron was not liable for the cleanup of Area 4. *Id*.[20] The district court reserved decision for the damages phase on the degree to which Chevron would be liable for response costs. *Id*. at 133.

Portec never owned or occupied any part of the Water Street Site, but was Area 2's neighbor to the northeast. NiMo pursued costs from Portec because NiMo believed Portec deposited waste in the Wynantskill Creek that then traveled into Area 2. The district court first held that NiMo was required to show that it had, or would, incur cleanup costs as a result of the hazardous substances found on Portec's property. *Id*. at 135. In other words, the district court held that NiMo must prove a nexus between Portec's release

[20] The district court dismissed Chevron's claims against the Rensselaer defendants as moot. *Niagara I*, 291 F. Supp. 2d at 135.

of hazardous substances and NiMo's cleanup costs. *Id*. at 136. The district court found that NiMo had not provided evidence of causation. *Id*. at 137.

The district court dismissed NiMo's New York Navigation Law claim because NiMo, as a petroleum discharger, could not bring a claim under New York Navigation Law § 172(3). *Id*. The district court also held that NiMo could not bring a claim under New York Navigation Law § 176(8) because it had remediated only manufactured gas hazardous wastes and not petroleum. *Id*.

The district court ruled that NiMo's state law contribution and indemnification claims were preempted by CERCLA as to King and Chevron, and dismissed those claims as to the other defendants because the defendants were not subject to liability for damages for the same injury to property. *Id*. The district court then denied NiMo's motion for summary judgment on its unjust enrichment claim against King and Chevron because NiMo failed to prove that there was no genuine issue of material fact. *Id*. at 140. Finally, the district court held that NiMo's public nuisance claim was time barred by a three-year statute of limitations and that *Oliver Chevrolet, Inc. v. Mobil Oil Corp.*, 249 A.D.2d

793, 794-95 (3d Dep't 1998), did not counsel extending it. *Niagara I*, 291 F. Supp. 2d at 138.

NiMo, U.S. Steel, Portec, and the King defendants,[21] along with defendants not party to this appeal, moved under Federal Rule of Civil Procedure 54(b) for entry of final judgment.  The district court granted summary judgment in favor of Portec, U.S. Steel, and Chevron — only with respect to Area 4 — on NiMo's CERCLA claims, and dismissed NiMo's state law claims.  NiMo appealed.  As noted above, in the ensuing years the case came to this Court on two occasions and on each visit we remanded the matter to the district court for reconsideration of an intervening ruling from the Supreme Court that gave greater definition to the statutory scheme for potentially responsible parties seeking recovery of response costs from other PRPs.

Following the second remand, the district court decided that NiMo's cleanup costs with regard to Chevron were not recoverable under CERCLA "because of the type of substances involved (asphalt, kerosene, naphtha, and naphthalene)." *Niagara III*, 565 F. Supp. 2d at 402.  The district court

---

[21] This includes King Service, Edwin King, Lawrence King, and Slote.

noted that pursuant to the 1992 and 2003 Consent Orders, NiMo was "responsible for removal and remediation of manufactured gas plant-related hazardous waste contamination only, that is, hazardous contamination caused by [NiMo] itself." *Id*. at 402-03. Thus all of NiMo's claims were dismissed by the district court. Again NiMo appealed.[22]

The standard is well known: summary judgment is appropriate when there exists no dispute of material fact. *See, e.g.*, *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). But the standard's utility functions only in the context of the statute that imposes or absolves a litigant from liability. All of the parties asked the district court to resolve the liability question as a matter of law. NiMo lost for a number of reasons expressed by the district court in its rulings that began in November of 2003 and culminated with the second remand decision now before us. We have already concluded that the district court erred in its conclusion that NiMo could not employ § 113(f)(3)(B), but that is not the end of the liability calculation.

---

[22] We review the district court's summary judgment conclusions *de novo*. *See Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000).

CERCLA is a remedial statute; it reaches as far back into the past as necessary to identify both the hazardous wastes present at a site and those responsible for them under the statute. The logic is straightforward and simple — Congress wanted owners and polluters to identify and clean up all the hazardous waste they discover. To further this goal, Congress made past and present owners, and others, liable for the hazardous materials they contributed. Recognizing, however, the practical difficulties of this statutory scheme, Congress also empowered the court through § 113 to use "such equitable factors *as the court determines are appropriate*" to reach a just result. 42 U.S.C. § 9613(f)(1) (emphasis added).

Congress[23] noted examples of the factors that it thought courts should consider in apportioning costs:

---

[23] CERCLA was hastily enacted and was a combination of three other toxic waste and oil spill cleanup bills that had not passed. Frank P. Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980*, 9 Colum. J. Envtl. L. 1, 1-2 (1982). CERCLA in its final form has scant legislative history. *Id*. at 1. Those interested in reviewing the history of CERCLA, then, often look to the history of the three other bills that informed the final product. *Id*. at 2; *see also* Committee on Environment and Public Works, *A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund)* at V-VII (1983).

(1) The ability of the party to demonstrate that his contribution to the release can be distinguished; (2) The amount of hazardous substance involved. Of course, a small quantity of highly toxic material, or above which releases or makes more dangerous another hazardous substance, would be a significant factor; (3) The degree of toxicity of the hazardous substance involved; (4) The degree of involvement of the person in the manufacture, treatment, transport, or disposal of the hazardous substance; and (5) The degree of cooperation between the person and the Federal, State, or local government in preventing harm to public health or the environment from occurring from a release. This includes efforts to mitigate damage after a release occurs.

S. Rep. No. 96-848, at 345-46 (1980).

While these factors may seem relevant to a liability determination, CERCLA purposefully lowered the liability bar required to be a PRP. As we have observed previously:

The plain meaning of th[e statutory] language dictates that [a party seeking costs] need only prove: [ ] there was a release or threatened release, which [ ] caused incurrence of response costs, and [ ] that the defendant generated hazardous waste at the cleanup site. What is *not* required is that the government [or another authorized party] show that a specific defendant's waste caused incurrence of cleanup costs.

*United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir. 1993) (emphasis in original).

This relaxed liability standard is appropriate when viewed in the context of the language of CERCLA. The statute focuses on two important goals: remediation of sites that present a clear and present danger to the health and

well-being of the communities in which they are located and identification of the source, or sources, of hazardous materials at sites that may have experienced commercial activity long ago (the record in this case alone dates back to the 1800s). Both goals suggest that caution is appropriate when evaluating a motion for summary judgment to dismiss a claim against a PRP in a CERCLA case. As we have noted, "Congress faced the unenviable choice of enacting a legislative scheme that would be somewhat unfair to generators of hazardous substances or one that would unfairly burden the taxpaying public . . . . [W]e think Congress imposed responsibility on generators of hazardous substances advisedly." *Alcan Aluminum*, 990 F.2d at 716-17.

Each hazardous waste site is unique in its combination of commercial activities, substances present, and history. In situations like the present case, the type of evidence, be it direct or circumstantial, and its quality, is to some degree impeded by the passage of time and the lack of business records reflecting the day-to-day operations of the industries then present at the Water Street Site. The available evidence of who did what at the relevant site is often dependent on inference. When determining CERCLA

liability, "there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001).

In practice, courts generally bifurcate a CERCLA proceeding, determining liability in Phase I, and then apportioning recovery in Phase II. During Phase I, courts have engaged in a very limited liability inquiry. *See Alcan Aluminum*, 990 F.2d at 720. We have previously commented on the "breadth" of CERCLA, and have held even a minimal amount of hazardous waste brings a party under the purview of the statute as a PRP. *Id*. The traditional tort concept of causation plays little or no role in the liability scheme. A party seeking to establish liability under CERCLA need not even show a specific PRP's waste caused cleanup costs. *Id*. at 721. The First Circuit defines liability similarly: "To satisfy the causal element, it is usually enough to show that a defendant was a responsible party within the meaning of 9607(a); that cleanup efforts were undertaken because of the presence of one or more hazardous substances identified

in CERCLA; and that reasonable costs were expended during the operation." *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir. 1999). The Ninth Circuit quite dramatically agrees, labeling CERCLA as a statute that allows "broad discretion" to impose liability on "anyone who disposes of just about anything." *A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir. 1998).

It is in Phase II, when damages are apportioned, that the relative strength of the evidence of liability becomes a relevant factor. *See, e.g.*, *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998) (Posner, J.) (a PRP's "spills may have been too inconsequential to affect the cost of cleaning up significantly, and in that event a zero allocation . . . would be appropriate"). In pushing such concerns to Phase II, we admit, as we have in the past, that, in the context of CERCLA, "causation is being brought back into the case — through the backdoor, after being denied entry at the frontdoor — at the apportionment stage." *Alcan Aluminum*, 990 F.2d at 722. District courts are authorized to use their broad discretion under CERCLA to employ the equitable factors, including consideration of the quality of the evidence that lead to liability. *See*

*Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 170 (2d Cir. 2002).

At the summary judgment stage, then, the analysis of a "genuine dispute of material fact" in the context of a § 113 claim under CERCLA might seem limited and constrained. The party seeking contribution must, of course, establish that the defendants qualify as PRPs under the statute and must demonstrate that it is probable that the defendants discharged hazardous material. But the party seeking contribution need not establish the precise amount of hazardous material discharged or prove with certainty that a PRP defendant discharged the hazardous material to get their CERCLA claims past the summary judgment stage. By referencing "equitable factors," the statute requires district courts to consider the practical difficulties in these cases. Summary judgment is only proper when a defendant establishes it is not liable at all under CERCLA — namely, it is not a PRP under the statute, there is no plausible evidence that it discharged hazardous materials, or it is eligible for one of the three affirmative defenses available under § 107. *See* 42 U.S.C. § 9607(b).

Defenses of minimal involvement or limited proof of

responsibility do have a role in the CERCLA scheme; they come in to play during the damages phase when the court is charged with equitably apportioning the costs of the cleanup among the PRPs.  That a party seeking contribution can only demonstrate a minimal amount of hazardous discharge from a particular PRP, or that the exact origin proportions are unknown, are the types of equitable factors a court should consider in the apportionment process.

Congress sought to further incentivize PRPs to pay for their role in the creation of a hazardous waste site regardless of when they polluted.  *See Toxic Substances Control Act Amendments: Hearings Before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce*, 95th Cong. 356 (1978).  To that end, parties seeking contribution — by definition PRPs who have already been charged with liability and resolved their exposure or PRPs confronted with reimbursement claims in a § 107(a) action — must be granted sufficient opportunity to pursue other PRPs and have the costs of cleanup borne equitably with others liable under the statute.

This summary judgment standard is in keeping with our

previous directive to liberally construe CERCLA in order to accomplish the congressional objectives. *W.R. Grace*, 559 F.3d at 89. *See generally* Blake A. Watson, *Liberal Construction of CERCLA Under the Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing Too Far?*, 20 Harv. Envtl. L. Rev. 199 (1996), *reprinted in Sutherland Statutes and Statutory Construction* § 65A:13 (Norman J. Singer & J.D. Shambie Singer, eds., 2009).

**A.   Chevron**

In 1955, Chevron purchased Areas 3 and 4 of the Water Street Site from the Republic Steel Company, and leased an easement over Area 2 for above-ground pipelines originating from Area 3.  Chevron used Area 3 for an asphalt terminal from approximately 1953 to 1998.  Chevron is the current owner of Area 3 and the easement; it sold Area 4 to Rensselaer County in 1974.  During the time when Chevron owned Area 4, Chevron leased the land back to Republic Steel.

Chevron argues that NiMo is only obligated to cleanup waste from manufactured gas production and, since Chevron was not in the business of manufacturing gas, Chevron cannot be liable for any of NiMo's costs.  Chevron is correct that,

under the Consent Order, NiMo was responsible for remediating the waste specifically related to manufactured gas. But NiMo first had to investigate the site to identify *all* hazardous waste present. Investigation costs are recoverable as response costs under CERCLA. *See* 42 U.S.C. § 9601(23). Thus, even if a PRP disposed of hazardous waste that was not related to manufactured gas, NiMo may pursue contribution for the PRP's share of the investigation costs.

The District Court originally held, in *Niagara I*, that "the CERCLA facility at issue here is the MGP facility," and that Chevron, as "a current owner of a portion of the former MGP facility . . . [was] a 'covered person' liable for response costs." *Niagara I*, 291 F. Supp. 2d at 131. We have no problem with that holding. But even if one treated the various areas as severable parts, we would reach the same conclusion.

For the easement over Area 2 and the entirety of Area 3, Chevron qualifies as a PRP under the statute because Chevron is "the owner or operator" of Area 3 and the easement over Area 2. 42 U.S.C. § 9607(a)(1). With regard to the easement over Area 2, there is evidence that hazardous substances may have leaked from Chevron's pipes

and may have been released when Chevron moved asphalt and other substances from barges onto its dock and through the pipes. Chevron does not deny the evidence that there were spills at the dock and pipe leaks in the soil, but argues that its asphalt and petroleum products are not hazardous substances under CERCLA, and thus Chevron cannot be held liable for their discharge. Chevron is correct that petroleum products are expressly excluded from the definition of hazardous substances. 42 U.S.C. § 9601(14). But though asphalt is not a hazardous material *per se*, NiMo introduced evidence that this asphalt facility produced or used hazardous materials that may have been released with the asphalt. In response, Chevron produced evidence that the waste products from manufactured gas contain "different and greater amounts" of hazardous materials than asphalt. Whether the amount of hazardous materials deposited is minimal is an equitable consideration the court may note during the apportionment of costs. The evidence presented is sufficient to present a genuine issue of material fact to defeat Chevron's motion for summary judgment.

As for Area 3, there was evidence that, in the early 1980s one of Chevron's railroad hoses ruptured and

discharged coal tar product into the ground.  In 1987, Chevron discovered a pinhole leak of coal tar from a tank on its property.  Chevron claims these are "microscopic incidents" and that it is entitled to summary judgment. Regardless of the characterization of these spills, NiMo has taken no remedial action and incurred no cost to investigate or cleanup Area 3.  In fact, NiMo reported to the DEC that its preliminary research found no hazardous substances at Area 3 and that no further investigation was necessary.  It would seem that in order for NiMo to recover costs, NiMo must prove first that it incurred them.  *See United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 184 (2d Cir. 2003). The district court correctly concluded that, at this stage of the cleanup process, NiMo cannot maintain a contribution claim against Chevron for Area 3.

Area 4 is more complicated.  While Chevron owned Area 4, it leased the property to Republic Steel.  Though Chevron argues otherwise, Chevron may be liable as a PRP if Republic Steel disposed of any hazardous substances at the Site because Chevron owned the facility.  42 U.S.C. § 9607(a)(2).

In 1960, after animals[24] and people got stuck in the open tar pits and one pit caught fire, Republic Steel attempted to remediate the pits on Area 4 by covering them with "earthen material." Relative to the standards at the time, capping the tar pits was supposedly a state-of-the-art technique. NiMo, however, presented evidence that capping could spread contamination by creating pressure that forced the hazardous materials to surface at the sides of the site and mix with surface water.

Under CERCLA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any . . . hazardous waste." 42 U.S.C. § 6903(3). NiMo argues that, by placing the caps, Republic Steel caused the tar from the pits to leak out into the surrounding area. NiMo claims leaking qualifies as disposal, and thus Chevron is liable because it owned Area 4 at the time of disposal of a hazardous substance. We agree. NiMo presented sufficient evidence to create a genuine issue of material fact as to whether the placement of the caps played a role in

_____

[24] There is particularly evocative testimony in the record about "the cow incident," when Chevron employees heard "something[] down south of the property bellowing" and discovered a cow "in the tar pit and she was almost up to the belly . . . all feet in."

redistributing the hazardous materials at Area 4.

In addition, the DEC noted that some of the hazardous materials found at Area 4 did not originate from NiMo's activity. This raises a question of fact as to whether Chevron or Republic Steel contributed other deposits, in addition to causing the leak in the pits.

**B. Portec**

Portec has never owned any of the land at the Water Street Site. However, between 1968 and 1997, Portec owned land to the northeast of Area 2, and used the land to house a rail-splitting plant that Portec operated from 1900 to 1989. During the time in question, the Wynantskill Creek ran along the northern part of Portec's property, crossed Area 2, and emptied into the Hudson River.

From 1908 on, Portec was a member of the Wynantskill Improvement Association. At various points, Portec also served as the chair and, eventually, the sole member of the Association. The Wynantskill Improvement Association was a nonprofit organization designed to improve the Wynantskill Creek for milling purposes through a variety of methods, including regulating the flow of the water, connecting lakes and ponds to the Creek, and constructing dams. Portec is

the sole remaining member of the Association, and consequently, may hold title to a portion of the Wynantskill Creek.

NiMo argues that Portec is liable as a PRP because its membership in the Association renders Portec responsible for the activities of the Association as a whole.  To NiMo, the Association's control of the Wynantskill Creek makes it liable for waste in the Creek.  NiMo alternatively claims that Portec is liable for contribution because it permitted the disposal of hazardous materials on its property, those hazardous materials entered the Wynantskill Creek and, eventually, they contaminated Area 2.  Portec counters that it is not liable under CERCLA because it never owned or operated any of the property at the Water Street Site, and that there is no legal basis for assigning CERCLA liability based on membership in a non-profit corporation.  We need not reach the thorny issue of whether membership in such an association could result in CERCLA liability because we find that Portec is liable under a much simpler theory.

Under § 107(a)(2), a PRP may be liable under CERCLA if it "at the time of disposal of any hazardous substance . . . operated any facility at which such hazardous substances

were disposed of." 42 U.S.C. § 9607(a)(2). The definition of operator is very broad in the CERCLA context. *See United States v. Bestfoods*, 524 U.S. 51, 65-66 (1998). To be an operator under the statute, a person "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." *Id*. at 66-67. Under this definition, Portec is a PRP under CERCLA because Portec "conducted operations specifically related to pollution" at the Wynantskill Creek. There is evidence that Portec's activities on its property resulted in hazardous waste deposits. Spent solvents and quench oils[25] were not properly removed from the plant. Underground pipes leaked fuel oil. Neighboring properties suffered spills. Soil sampling from the Portec property revealed a number of hazardous substances in the ground. More importantly for NiMo's purposes, there is evidence that these hazardous deposits made their way into the Wynantskill Creek and into the Hudson River. Portec used the Wynantskill Creek to discharge waste from its plant. Surface and ground water traveled across Portec's property into the Creek. The

---

[25] Quench oil is oil used to cool heat-treated metal.

Creek, in turn, passed through Area 2 on its way to the Hudson.

During its travels across Area 2, the water in the Creek appears to have left behind hazardous materials. These hazardous materials, according to one of NiMo's experts, originated at the Portec Plant. In the planned remediation of Area 2, NiMo may have to cleanup this waste, along with the waste that NiMo itself deposited there. Thus, Portec operated a facility where hazardous waste was deposited and NiMo may have to clean that waste as part of its remediation plan for Area 2. This meets the necessary statutory elements to attach liability to Portec. Because Portec qualifies as a PRP under CERCLA, and because there is evidence in the record that Portec may have deposited hazardous materials that settled in Area 2, the district court erred in its grant of summary judgment to Portec.

**C.  King**

In 1957, King Service, Inc. leased Area 2 from the then-owner and began operating a petroleum distribution facility. In a series of transactions between 1968 and 1973, King purchased Area 2, save a bit of land where the Wynantskill Creek enters the Hudson River. King is the

current owner of Area 2.

NiMo presented undisputed evidence that there are hazardous wastes located on Area 2. King, as the current owner of the contaminated property, is indisputably liable as a PRP. *See* 42 U.S.C. § 9607(a)(1). The district court concluded the same, but ultimately dismissed the complaint as to King because the court incorrectly determined that NiMo did not qualify for contribution under § 113(f)(B)(3). The grant of summary judgment to King was improper.

**D. U.S. Steel**

U.S. Steel, or its predecessors, owned the Water Street Site from 1902 to 1922. U.S. Steel operated iron and steel manufacturing facilities at Areas 1 and 2. From 1907 to 1922, U.S. Steel dismantled structures and equipment at an idle steel plant on Area 1. U.S. Steel also demolished the old Bessemer Steel Works that had been in use since the late 1860s to convert iron to steel on Area 2. The demolition generated materials that U.S. Steel dumped, along with byproducts from its own iron and steel manufacturing, at a landfill it owned and operated at Area 4. As a result of U.S. Steel's dumping at Area 4, this area allegedly grew in acreage. NiMo seeks contribution from U.S. Steel as the

owner or operator of property who disposed of hazardous waste on its property, and as an arranger. 42 U.S.C. § 9607(a)(2)-(3).[26] NiMo contends that U.S. Steel deposited hazardous waste from its demolition and industrial activities. U.S. Steel contends that NiMo's allegations are based on speculation and are without evidentiary basis.

CERCLA liability may be inferred from the totality of the circumstances as opposed to direct evidence. *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000). Because the relevant time period was from 1902 until 1922, both NiMo and U.S. Steel were forced to rely primarily on circumstantial evidence resulting in a battle of experts. NiMo's experts concluded that U.S. Steel's activities resulted in the deposit of hazardous materials while U.S. Steel's experts concluded that its activities did not. The battle bespeaks of a dispute of material fact for purposes of CERCLA liability.

---

[26] Under CERCLA, "arranger" is shorthand for "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

U.S. Steel was an owner of the property in question; there is evidence in the form of expert testimony, albeit disputed, that U.S. Steel caused hazardous deposits on the property. CERCLA does not require a smoking gun. The credibility of the experts, the type of evidence presented, the amount of hazardous waste involved, and the degree of U.S. Steel's involvement in the identified hazardous deposits are all relevant as equitable factors for the district court to use in apportioning response costs. At this stage, however, NiMo's claims against U.S. Steel survive summary judgment; U.S. Steel qualifies as an owner under § 107 and NiMo has presented evidence that hazardous deposits may have been generated and deposited at the site on U.S. Steel's watch.

**E.  National Contingency Plan**

The district court determined that there was a genuine issue of material fact as to whether NiMo's cleanup efforts were consistent with the National Contingency Plan. We have never squarely addressed whether compliance with a state consent decree is sufficient to prove adherence to the National Contingency Plan.

Under § 107, a PRP is liable for cleanup costs

consistent with the national contingency plan. 42 U.S.C. § 9607(a)(4)(A)-(B). The National Contingency Plan is essentially the federal government's toxic waste playbook, detailing the steps the government must take to identify, evaluate, and respond to hazardous substances in the environment. *See* 40 C.F.R. part 300; *see also* Travis Wagner, *The Complete Guide to the Hazardous Waste Regulations: RCRA, TSCA, HMTA, EPCRA, and Superfund*, 3d, 326-27 (1999). Adherence to the plan is the gatekeeper to seeking reimbursement of response costs. Ultimately, the goal is "consistency and cohesiveness to response planning and actions." H. Rep. 96-1016, at 30 (1980).

Courts presume that actions undertaken by the federal, or a state, government are consistent with the National Contingency Plan. *See, e.g.*, *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 91 (1st Cir. 2008). However, private parties that have responded to hazardous substances must establish compliance. *Id*. One way of establishing compliance with the national plan is to conduct a response under the monitoring, and with the ultimate approval, of the state's environmental agency. *Id.; see also NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000). This

is consistent with the state's power to settle CERCLA liability without the express approval of the EPA. It would be bizarre indeed if a PRP's settlement with a state entitled it to seek contribution under § 113(f)(B)(3), but its actions taken in executing that settlement disqualified the settlor from employing the statute to recoup a portion of its expenses.

NiMo's adherence to the DEC Consent Decree established its compliance with the National Contingency Plan. The district court's conclusion in this regard was error.

**VI.      STATE LAW CLAIMS**

**A.   New York Navigation Law Claims**

Under New York Navigation Law, anyone who has "discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages." N.Y. Nav. L. § 181(1). This includes costs incurred from investigation and remediation of petroleum. *See, e.g.*, *New York v. LVF Realty Co.*, 59 A.D.3d 519, 521 (2d Dep't 2009). A party who shoulders the cleanup and removal costs and is not at fault for the petroleum discharge may pursue a claim against the actual polluters. N.Y. Nav. L. §§ 172(3), 181(5). NiMo brought

Navigation Law claims against the defendants for their discharge of petroleum. However, NiMo had also discharged petroleum at the Water Street Site. As the district court correctly concluded, under the language of § 181, NiMo cannot pursue claims against the defendants because NiMo is at fault for at least some of the petroleum discharge at the site.

However, there is an additional provision of New York Navigation Law that affords NiMo a cause of action. Under § 176(8), "every person providing cleanup [or] removal of discharge of petroleum . . . shall be entitled to contribution from any other responsible party." N.Y. Nav. L. § 176(8). "Every person" is obviously inclusive and the language "other responsible party" indicates that the drafters were aware that "every person" could encompass a responsible party. NiMo is entitled to seek contribution for its response costs related to petroleum discharges.

We agree with the district court that NiMo did not incur any cleanup costs with respect to Area 3, however, NiMo — in complying with the Consent Order — incurred costs to cleanup Areas 1, 2, and 4. NiMo cleaned up a variety of materials, some of which contained petroleum and petroleum

products.  There is a genuine issue of material fact as to the liability of the remaining defendants for contribution with regard to costs incurred by NiMo to cleanup and remove unlawfully discharged petroleum.

### B.    Contribution, Indemnification, and Unjust Enrichment Claims

The district court dismissed NiMo's claims against King and Chevron for contribution under New York law, concluding that CERCLA preempted the state claims.  *Niagara I*, 291 F. Supp. 2d at 137.  The district court also dismissed NiMo's state law contribution claims against U.S. Steel and Portec because the district court had already determined that U.S. Steel and Portec were not liable for the remediation of the Water Street Site.  *Id*.

CERCLA could preempt state law in one of three ways: (1) Congress expressly indicated that CERCLA preempts state law; (2) CERCLA is a comprehensive regulatory scheme such that it creates a reasonable inference that the state cannot supplement it; or (3) state law directly conflicts with CERCLA.  *See Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987).  We have previously held that CERCLA does not expressly preempt applicable state law.  *Marsh v.*

*Rosenbloom*, 499 F.3d 165, 177 (2d Cir. 2007). We have also concluded that CERCLA is not such a comprehensive scheme that it cannot be supplemented by state law. *Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2d Cir. 1998), *overruled on other grounds by W.R. Grace*, 559 F.3d at 90. That leaves only preemption by conflict, which exists when "compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) (quoting *United States v. Locke*, 529 U.S. 89, 109 (2000)) (internal quotation marks omitted).

CERCLA depends on a federal and state partnership to assist the national government in identifying and remediating hazardous wastes sites consistent with the National Contingency Plan. But while a state can settle a PRP's CERCLA liability, that authorization does not compel the conclusion that Congress intended that parties who have settled their CERCLA liability should have both a federal and a state law based claim for recovery of the same response expenditures. CERCLA employs state agencies in

identifying and remediating hazardous waste sites while providing a federally defined settlement enticement. Congress created the statutory right to contribution in § 113(f) in part to encourage settlements and further CERCLA's purpose as an impetus to efficient resolution of environmental hazards. *See Atl. Research*, 551 U.S. at 141; *see also Marsh*, 499 F.3d at 180. Section 113 is intended to standardize the statutory right of contribution and, in doing so, avoid the possibility of fifty different state statutory schemes that regulate the duties and obligations of non-settling PRPs who might be viewed as tortfeasors under the law of any particular state. Based on the text, § 113 was intended to provide the only contribution avenue for parties with response costs incurred under CERCLA.[27] *See* 42 U.S.C. § 9613(f)(3)(C) ("Any contribution action brought under this paragraph shall be governed by Federal law."). Thus we conclude that state law contribution claims for

---

[27] Our cases — *Consolidated Edison* and *W.R. Grace* — have recognized that there are situations where a settlement with the DEC encompasses only state law based liability. We suspect that the United States, given the views it has expressed in its amicus brief, might view the matter differently. If *any* settlement with a state environmental agency qualifies as a state administrative settlement under CERCLA, it would seem that CERCLA has preempted the area of contribution claims that arise out of the settlement.

CERCLA response costs conflict with CERCLA contribution claims and therefore are preempted.[28]

NiMo makes no claims for cleanup costs outside of those it expended in compliance with the Consent Order and we have already determined that costs incurred pursuant to the Consent Order, as amended, fall within CERCLA.  Because NiMo did not incur costs outside of CERCLA, NiMo has no grounds for contribution under New York law and we affirm the district court.

We are left then with NiMo's indemnification and unjust enrichment claims.  We have previously concluded that state

[28] We are not the first circuit to reach this result. *See PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998) (Posner, J.); *see also In re Reading Co.*, 115 F.3d 1111, 1117 (3d Cir. 1997) *abrogated on other grounds by E.I. DuPont De Nemours & Co. v. United States*, 460 F.3d 515, 522 (3d Cir. 2006).  More generally, our conclusion is in keeping with other courts' determinations that CERCLA is intended to be the exclusive scheme governing hazardous waste claims that fall within its purview.  *See, e.g., Barnes ex rel. Estate of Barnes v. Koppers, Inc.*, 534 F.3d 357, 365 (5th Cir. 2008) (when the "conditions for CERCLA cleanup are satisfied," CERCLA's tolling provision preempts the state law tolling provision); *Fireman's Fund Ins. Co. v. City of Lodi, Cal.*, 302 F.3d 928, 946 (9th Cir. 2002) (if the defendant is found to be a PRP, CERCLA preempts the defendant's contribution protection provided by the local environmental and liability ordinance); *Town of Munster, Ind. v. Sherwin-Williams Co.*, 27 F.3d 1268, 1273 (7th Cir. 1994) (limiting "the defenses to liability under CERCLA to those enumerated in the statute" and barring equitable defenses).

law indemnification claims were preempted by CERCLA, a conclusion that we reiterate today. *Bedford Affiliates*, 156 F.3d at 427.[29] We also hold that the state law claims for unjust enrichment are preempted for substantially the same reasons as detailed above — allowing unjust enrichment claims for CERCLA expenses would again circumvent the settlement scheme, as PRPs could seek recompense for a legally unjustifiable benefit outside the limitations and conditions of CERCLA.

### C. Public Nuisance

The district court dismissed NiMo's claim for public nuisance as time barred. *Niagara I*, 291 F. Supp. 2d at 140. NiMo offers no argument to contest this ruling. Therefore, we affirm the district court.

### V. CHEVRON'S CROSS-APPEAL

Chevron cross-appeals on several grounds. First, Chevron challenges the district court 's *sua sponte* dismissal of Chevron's third-party action against Rensselaer County, which purchased Area 4 from Chevron in 1974. The district court reasoned that the third-party action was moot

---

[29] Though *Bedford Affiliates* was overruled by *W.R. Grace*, the panel's decision that CERCLA preempts state indemnification claims remains undisturbed.

because the district court had absolved Chevron of liability for Area 4. *Id*. at 135. Chevron argues that, should we decide to reinstate NiMo's CERCLA contribution claims against Chevron for Area 4, then we should also reinstate Chevron's claim against Rensselaer County. We agree. Because we have reinstated NiMo's CERCLA contribution claims as to Area 4, we reinstate Chevron's claim against Rensselaer County.

Chevron also appeals the district court's dismissal of Portec and U.S. Steel from the case. As we have reversed the district court and reinstated NiMo's claims against both Portec and U.S. Steel, Chevron's cross-claims for contribution against Portec and U.S. Steel are also reinstated.

**VI. CONCLUSION**

We reverse the orders of the district court dismissing U.S. Steel, Chevron, Portec, and King Service from the litigation. There are genuine issues of material fact with respect to the defendants contribution liability to NiMo.

NiMo is entitled to bring a claim for contribution under § 113(f)(3)(B). A potentially responsible party's CERCLA liability settlement with a state qualifies the PRP

for contribution under § 113(f)(3)(B) and the state agency does not need express authorization for the settlement from the EPA.  NiMo satisfied the requirements of the National Contingency Plan by settling its CERCLA liability with New York.  Because NiMo resolved its CERCLA liability through an administrative settlement, it is not entitled to bring a claim under § 107(a)(4)(B).

We reverse the district court's dismissal of NiMo's claim for contribution under New York Navigation Law, and affirm the district court with respect to its dismissal of NiMo's remaining state law claims.  We reinstate Chevron's third-party claims against Rensselaer County for consideration by the district court in light of our reinstating NiMo's claims against Chevron and we further reinstate Chevron's cross-claims for contribution against Portec and U.S. Steel.

The district court's orders of November 6, 2003, March 11, 2004, June 28, 2006, and July 16, 2008 are hereby AFFIRMED in part and REVERSED in part.

TROY WATER STREET SITE MAP

